### THE EVEROSA.

### WILLIAM H. SWAN & SONS, Inc., v. F. GRAUDS KUGNIECIBAS AKD. SAB.

### OLIVER REEDER & SON, Inc., v. SAME.
#### Nos. A–15163, A–15166.

District Court, E. D. New York.
July 6, 1937.

Crowell & Rouse, of New York City, for libelants.

P. A. Beck, of New York City, for claimant.

BYERS, District Judge.

These causes were tried together because they involve closely allied facts concerning the sale of supplies for the S. S. Munorway during 1934, whereby each libelant seeks to establish a lien against the vessel. The libels were filed April 7 and 9, respectively, 1937.

In each cause, in lieu of evidence, a stipulation has been filed, and brief reference should be made to the facts as so embodied.

As to the first cause, the libelant is a Virginia corporation, having its principal office in Norfolk. The Munorway called at that port in January, 1934, and her master prepared a list of stores and supplies other than fuel, and delivered it to Taylor & Andrews, the local agents of Munson Steamship Line, to which the vessel was under a 30-day charter.

The vessel was owned by a Norwegian corporation and her registry was of Oslo. The Munson line owned all but three qualifying shares of stock in that corporation.

By the terms of the charter, the supplies in question were required to be furnished by the owner, not the charterer.

Taylor & Andrews submitted the master's list to the New York office of Munson, whence it was returned with the request that the quantity be reduced, in con-templation of a shorter ensuing voyage than the master's instructions had previously indicated, and the supplies were furnished according to an amended list.

Whether the abbreviation in the list was made by Taylor & Andrews, acting for Munson, or by the master acting for the ship, is not stated in the stipulation. Perhaps, as a practical matter, it comes to the same thing, since Munson in reality was both owner and charterer, though in legal concept the entities were separate. Cf. New York Trust Co. v. Bermuda-Atlantic S. S. Co. (D.C.) 211 F. 989.

The stipulation as to the placing of the order is that "Libelant's witnesses, if called, would testify that the verbal order for the supplies on the amended list was given either by a representative of Taylor & Andrews, or by the master, or by both together".

The claimant is without evidence on the subject, because it is a corporation of Latvia which purchased the vessel on August 16, 1934, when she was in Rotterdam, Holland, without knowledge of the fact that the supplies in question had not been paid for. Transfer to Latvian registry and flag at once ensued and the vessel's name was changed to Everosa.

That purchase was made from the Norwegian corporation and the bill of sale was joined in by the Trustees of the Munson Steamship Line, then in 77B (11 U.S. C.A. § 207) proceedings in the Southern District of New York which had been instituted June 11, 1934. That document contained a warranty, on the part of the debtor corporation, that the vessel was free from liens and that the purchaser would be held harmless from any liens that might have to be paid.

If that undertaking gives rise to a possible administrative expense of the Trustees, which no one has argued in this cause, and as to which it would not be appropriate to venture an opinion, the equities are rendered quite uncertain.

The proctor for claimant argues that its only claim would be against the debtor, the time to file which has expired. If that is so, and there is no permission granted to file nunc pro tunc, the question of laches, presently to be considered, will be affected by that aspect of the situation.

The claimant argues, first, that the creation of the lien itself has not been clearly shown, because of the disjunctive form in

which the quoted portion of the stipulation is cast; and second, that the libelant has been so lacking in diligence that the libel should be dismissed for laches.

The Munorway, having taken the supplies, cleared Norfolk on February 8, 1934. Her subsequent visits to United States ports were as follows:

| | | | | | |
|---|---|---|---|---|---|
| Tampa | Arrived Mar. | 3, 1934, | Sailed Mar. | 7, 1934 | |
| Tampa | " Mar. | 30, 1934 | " April | 3, 1934 | |
| New Orleans | " Apr. | 6, 1934 | " May | 2, 1934 | |
| Freeport, Tex. | " May | 4, 1934 | " May | 5, 1934 | |
| Mobile, Ala. | " May | 8, 1934 | " May | 8, 1934 | |
| Norfolk | " May | 16, 1934 | " May | 17, 1934 | |
| Providence, R. I. | " Nov. | 26, 1934 | " Dec. | 8, 1934 | |
| New York, N. Y. | " Dec. | 9, 1934 | " Dec. | 17, 1934 | |

(1935—no visits to American waters.)
(1936—no visits to American waters.)

| | | | | |
|---|---|---|---|---|
| New York, N. Y. | Arrived Jan. | 9, 1937 | Sailed Jan. | 13, 1937 |
| Boston | " Jan. | 14, 1937 | " Jan. | 30, 1937 |
| New York, N. Y. | " Apr. | 5, 1937 | | |

The master of the Munorway died in Norway during July of 1935, and his testimony therefore, as to the giving of the order for the supplies, is not available.

Whether the lien as asserted ever had a valid inception, is necessarily to be determined.

The statute (title 46 U.S.C. § 972 [46 U.S.C.A. § 972]) names the managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is entrusted, as those presumed to have authority from the owner, to procure supplies.

The previous section provides that any one furnishing supplies shall have a maritime lien on the vessel, which may be foreclosed without proof that credit was given to the vessel.

It seems unnecessary to devote time to the discussion prompted by claimant as to the creation of the lien. While the stipulation is in the disjunctive, it is not to be scrutinized as an indictment in a criminal cause.

If the master and Taylor & Andrews cooperated so as to induce the libelant to furnish the supplies, the precise contribution of each to the result is unimportant. The Munson Line in effect owned this vessel, or its Trustees under section 77B of the Bankruptcy Act would not have joined in executing the bill of sale. Tay-

lor & Andrews represented them and it is no part of the court's duty, as presently understood, to seek to ascertain whether they were functioning in behalf of the owner or the charterer. Presumably it was in the former guise, or there would have been no reference of the master's original list to the Munson Line, since as char-terer there was no duty resting upon it concerning supplies.

It is concluded therefore that a valid maritime lien against the Munorway arose on February 8, 1934, when the last of the supplies was taken.

The fair and reasonable value of the supplies is agreed to be the amount stated in the libel—$1,553.18.

The question of laches is more perplexing.

There is a provision in the Virginia statutes that maritime liens continue until paid, and are preferred to all other liens except mariners' wages. That would simplify the problem considerably except for the change in ownership which has been recited, and which was accomplished without knowledge of this lien.

The law as stated in The Key City, 14 Wall. (81 U.S.) 653, 20 L.Ed. 896, was deemed to control as recently as 1933, in The Owyhee (C.C.A.) 66 F.(2d) 399, in this Circuit, the summary statement of which reads as follows:

"We think that the following propositions as applicable to the case before us may be fairly stated as the result of these authorities:

"1. That while the courts of admiralty are not governed in such cases by any statute of limitation, they adopt the principle that laches or delay in the judicial enforce-

ment of maritime liens will, under proper circumstances, constitute a valid defense.

"2. That no arbitrary or fixed period of time has been, or will be, established as an inflexible rule, but that the delay which will defeat such a suit must in every case depend on the peculiar equitable circumstances of that case.

"3. That where the lien is to be enforced to the detriment of a purchaser for value, without notice of the lien, the defense, will be held valid under shorter time, and a more rigid scrutiny of the circumstances of the delay, than when the claimant is the owner at the time the lien accrued."

Another quotation is deemed apposite. In The Marjorie (C.C.A.1907) 151 F. 183, 185, it is said:

"As commercial enterprise would be vexatiously incommoded and the free circulation and disposal of vessels prevented if such liens, which are not required by law to be made manifest by public registration, were allowed to lie dormant for an indefinite period, the courts have uniformly held, where the rights of bona fide purchasers will be injuriously affected if it is allowed to prevail, that the lien is lost if there has been long delay, and there has been reasonable opportunity to enforce it. The diligence required is usually measured by the opportunity of enforcement. In nearly all of the cases where the courts have held the lien to be lost and where there has been change of possession, there has been unreasonable delay on the part of the creditor in availing himself of the opportunities of enforcing his lien."

That case was cited with approval in The Commack (C.C.A.) 299 F. 229.

It becomes necessary therefore to determine whether this claimant can be said to have been lacking in diligence in failing to take advantage of opportunities to enforce its lien.

The occasions upon which a libel could have been filed were five during the months of March, April and May, 1934, at the Gulf ports which have been listed, and one during the latter month at Norfolk. As to the former, the stipulation makes it clear that the change of destination, from Nicaragua to ports on the Gulf, was known to the libelant, for it was the occasion of cutting down the list, so that it is to be charged with knowledge that a

libel in rem would be available if the attempt had been made to ascertain the whereabouts of the vessel during those months. Failure to do that, standing alone, is not thought to be sufficient to defeat the lien.

The presence of the Munorway in Norfolk on May 16 and 17, 1934, is not so easily to be overlooked. Over three months had elapsed since the supplies were delivered; the vessel was known to be of foreign registry, and to be engaged in peripatetic pursuits. The claimant is a ship chandler and is familiar with the hazards of that calling. This definite display of indifference, touching the opportunity to enforce its lien through appropriate action, cannot fail to count heavily against it, in balancing the equities.

The vessel was next in ports of the United States, as has been shown, in the months of November and December of the same year, when she remained for 12 days in Providence and 8 days in New York, but then she was under her new name, registry and ownership.

It is true that knowledge of these changes is not brought home to the libelant, but the question is whether diligent inquiry might not have brought the facts to light.

The filing of the petition under section 77B on the part of the Munson Line had been a matter of history for over five months, on November 26, 1934, when the vessel arrived in Providence.

While there is no proof on the subject, the court is not blind to the fact that the Munson Line creditors (of whom the libelant was one, for it filed a contingent proof of claim) were duly apprised of the proceeding—which means that inquiry of the Trustees by the claimant would have disclosed the sale of the vessel in August of that year. Further inquiry, namely, reasonable diligence, would have brought to light the identity of the purchaser, and the change of name and registry.

That this is not a far-fetched view is shown by the statement during the argument, that the Southern Coal & Coke Company filed a libel in the Rhode Island District Court on November 24, 1934, against this vessel (See The Everosa, 18 F.Supp. 186) for bunkers taken November, 1933, and May, 1934. If that creditor could inform itself concerning the status and whereabouts of the ship, there can be nothing unreasonable in the view that a like

display of diligence on the part of this libelant would have revealed a purpose to protect its lien, throughout 1934.

The vessel was not in any port of the United States during the years 1935 and 1936, but she spent 4 days in New York in January of 1937, and 16 days in Boston during the same month, without manifestation of activity by this libelant, who did not file this libel until April 7th, when the vessel was again in New York.

 It is thought that this cumulative record of apathy during 1934, and January of 1937, points to the necessity for concluding that the equities of the claimant outweigh those of the libelant. It is not thought that the death of the master is significant, since the creation of the lien could scarcely be defeated, even if his testimony were available that he did not order these supplies. It is thought, however, that the failure of the claimant to libel the vessel at any available time prior to May 17, 1934, lulled the purchaser into failing to protect itself against possible liens, at the time of the transfer of title in August of that year.

Doubtless the Trustees would have credited the amount of the libelant's charges against the purchase price, had they known of the assertion of the lien, for that is what their warranty involves; but whether that undertaking can now be enforced has not been the subject of elucidation in this cause.

For present purposes, the innocent purchaser is assumed to be subject to a substantial loss, if the libel is to be upheld.

Under the circumstances which have been stated, it is deemed that the balance of equities lies with the claimant, and the libel must be dismissed with costs.

The facts in the second cause are briefly as follows: The libelant is a Maryland corporation, which manufactures and sells vessel paints, having its principal office in Baltimore, and a selling agent, Woodward, Wight & Co., in New Orleans.

When the Munorway was in the latter port on April 26, 1934, at a shipyard, undergoing repairs, paint was required for her bottom and sides. The master made known the requirement, but to whom, other than the Munson Line, does not appear.

 The stipulation is: "Witnesses for the libelant, if called, would testify that said Konrad Meidell, master, verbally requested and ordered the paint sued for herein. Agents of the Munson Steamship Line, if called, would testify that the order was placed by Munson Steamship Line in New York with the New York office of the libelant, and that no inquiry was made by libelant as to the ownership of the vessel, and that the master of the vessel personally made no written requisition on the libelant for the paint, and that on April 30, 1934, after the paint had been supplied, a bill for the said paint was submitted by the New York office of the libelant to the New York office of Munson Steamship Line, a copy of which is attached."

That bill reads: "Sold to Munson Steamship Line, 67 Wall Street, New York, N. Y." three items totaling $354.00, and at the foot appears: "S/S Munorway @ Johnson Dry Dock, New Orleans, La."

The paint was delivered on board the vessel and receipted for by the chief officer.

The receipt is not in evidence.

Libelant would testify to delivery "to the master of the vessel and to the vessel's agent or persons to whom the management (etc. as per section 972 of the statute) copies of libelant's bills or invoice dated April 30, 1934," etc.

The amount sued for is not in issue, the reasonable value being as stated.

There is no statute in Louisiana touching maritime liens.

It is further agreed that Munson Line officers would testify that libelant had supplied their ships for many years at New Orleans, the bills being paid at the New York office of Munson, and that the latter had established a line of credit as the result. No question of lien, or waiver thereof, had ever been discussed between Munson and libelant, nor was there an existing contract for regular or exclusive supply by libelant to the Munson vessels, and that these supplies were furnished on Munson credit.

The foregoing facts are deemed to fall short of establishing that the master ordered this paint from the libelant. For all that the libelant shows, he may have merely made known his needs to the New Orleans agents of Munson, who communicated them to the New York office, where the paint was ordered, as has been stated. The bill shows that the sale was to the Munson Steamship Line. The name and location of the ship are deemed to have been inserted for iden-

tification of the charge for accounting purposes, but not to recite a sale of paint to the ship.

If the lien arose, it was because the Munson Line, the actual though not the apparent owner, created it by ordering these supplies for the vessel.

Under ordinary circumstances, the law would presume a lien on proof of due delivery, The Bronx (C.C.A.) 246 F. 809.; and the presumption can be destroyed only on affirmative proof that the Munson Line was to be exclusively liable for payment.

Clearly there is no such affirmative evidence as was present in The President Arthur, 279 U.S. 564, 49 S.Ct. 420, 73 L.Ed. 846, but there is some, namely, the testimony of the neutral witnesses referred to in the stipulation as officers of the Munson Steamship Line, who would testify "that these supplies were furnished on Munson's credit."

The omission of the word "exclusive" from this stipulation is thought to be significant. The libelant was entitled to look to both the Munson Line and the vessel, in the absence of affirmative evidence that it agreed not to do the latter, or refused to under circumstances closely akin to those shown in The President Arthur, supra.

The issue is resolved in favor of the creation of the lien by the actual owner of the vessel.

The same argument is made as.to laches, which was urged in the first cause, but with less effect.

There was no visit by the vessel to New Orleans, after the paint was supplied, which could be likened to the two days in May in Norfolk, in the Swan case. The Gulf port visits were so close in point of time to this delivery that lack of diligence, on the part of this libelant, cannot be predicated of a failure to pursue the ship then.

As against Reeder, the presence of the vessel under her new name in Providence and New York in November and December of 1934, and in New York and Boston in January of 1937, provided the only opportunities which this libelant had to proceed in rem against the vessel, until this libel was filed April 9, 1937.

While the same inattention to the lien with reference to the months of November and December, 1934, can be urged against Reeder as in the case of Swan, those visits afforded the first occasions for taking affirmative action which were neglected, and it is thought that libelant's failure to take advantage of them does not fatally portray lack of diligence.

The equities are so nearly in balance that the libel should not be dismissed. Accordingly a decree in favor of this libelant may be entered with costs.

Settle decrees, and findings if desired.