93 F.2d 732 (1937)
THE EVEROSA.
SOUTHERN COAL & COKE CO.
v.
F. GRAUDS KUGNIECIBAS.
No. 3247.
Circuit Court of Appeals, First Circuit.
December 8, 1937.
Paul Johnston, of Birmingham, Ala., and Archibald C. Matteson, of Providence, R. I. (Forney Johnston, and Cabaniss & Johnston, all of Birmingham, Ala., on the brief), for appellant.
P. A. Beck, of New York City (Harold R. Semple, and Raymond & Semple, all of Providence, R. I., on the brief), for appellee.
Before BINGHAM, WILSON, and MORTON, Circuit Judges.
*733 MORTON, Circuit Judge.
The question is whether the steamship Everosa is subject to a maritime lien in favor of the libelant for coal furnished to her at Mobile, Ala., on November 22, 1933, and May 8, 1934. On final hearing in the District Court the steamer was held not liable and the libel was dismissed. Libelant has appealed. The facts are as follows:
At the time when the coal in question was furnished, the Everosa was called the Munorway and was owned by a Norwegian company. She was sold to her present owners, a Latvian company, and her name was changed in August, 1934. The Norwegian company was a subsidiary of the Munson Steamship Line of New York and the steamer at the time in question was under a time charter to the Munson Line. The charter party provided, inter alia, that bunker fuel should be furnished by the charterer; but it contained no provision forbidding the charterer from subjecting the vessel to maritime liens.
The coal in question was supplied by the libelant under a standing contract between it and the Munson Line dated April 16, 1933. The terms of the contract now material were as follows:
"The buyer agrees to buy, and the seller agrees to sell coal in the amount and upon the terms and conditions herein specified.
"Duration of Contract Beginning April 16, 1933, and Ending April 15, 1935.
"Quantity Requirements, Estimated 10,000 to 25,000 Tons per year.
"Grade Boothton 2-inch Washed Bunker Coal.
"Price $1.25 per net ton F. O. B. cars Boothton, Alabama."
Then followed certain provisions which need not be stated for adjustment of the price to meet changes in laws or regulations. The contract continued:
"Type Equipment as specified
"Routing as specified
"Weights Southern Weighing & Inspection Bureau Railroad Track Scale weights at the Mines to govern all settlements.
"Terms All Coal to be paid for on the 10th of each month for Coal shipped during preceding calendar month.
"If the credit of the purchaser at any time in the judgment of the seller becomes impaired, the seller shall have the right to require payment for all the Coal previously shipped, and in advance for all to be thereafter shipped, before making further shipments.
"The seller shall not be responsible for delays in the delivery, or failure to deliver, caused by car supply, or other causes beyond our control."
As to the first item, in November, 1933, the Munorway was on voyage from Mexico to Tampa and was to be refueled at Mobile. A few days before she was due there, the Munson Line representative at New Orleans telegraphed the libelant at Boothton, Ala., to have 725 long tons of coal at Mobile on the morning of November 22 for the Munorway's bunkers. This order was acknowledged by the libelant with the statement that coal would be at Mobile in ample time to take care of the vessel. The coal was loaded on cars at Boothton and reached Mobile at the date stated; it was shipped on bills of lading consigned to Bay City Fuel Company at Mobile. On arrival there it was loaded on the steamer from railroad cars and was trimmed into her bunkers by the Bay City Company. The Bay City Company was employed by the coal company and appears to have had no contractual relations with Munson. Its charge for trimming and the freight from Boothton to Mobile were included in the coal company's bill. The coal was billed by the libelant to the "S. S. Munorway and owner Munson Steamship Line." The steamer's master and chief engineer signed receipts, stating it was "received of Southern Coal & Coke Co., Boothton, Alabama," etc. The master of the steamer paid for the coal on delivery by giving to the libelant's representative a thirty-day draft on the Munson Line to the order of the coal company for the amount due, including, as has been said, the cost of the coal and transportation and trimming charges.
When the first draft fell due, the Munson Line appears to have been unable to meet it in full and arranged with the libelant to pay $1,000 and give a note for the balance, it being stated that this was done without waiver or prejudice to any lien upon said vessel. The balance of this note, less other partial payments, forms part of the present claim. It seems clear that if the libelant had a lien on the steamer for the coal which was furnished, the lien was not lost by anything which was done with relation to the payments by drafts or notes.
*734 The second bunkering of the Munorway took place at Mobile on May 8, 1934. The circumstances, mutatis mutandis, were the same as before. The master's draft on the Munson Line for $2,216.62 in payment for the coal and charges was later, by agreement of the parties, converted into a promissory note of the Munson Line which was accepted by the coal company "without waiver and prejudice to any lien upon said vessel."
The libelant did not know that the Munorway was under charter; it made no inquiry on that point. There is no reason to suppose that if it had inquired it would not have been told the facts.
The District Judge held that the coal was delivered by the coal company to the Munson Line under the outstanding contract between them; that the title to it passed when it was put on the cars at Boothton; that the coal was not restricted to any particular vessel; that the consignment to the Bay City Fuel Company was not a reservation of title in the seller, but was done for the convenience of the buyer in getting the coal trimmed. He accordingly held that the case was controlled by Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97, and dismissed the libel on the ground that the coal was not furnished by the libelant.
The decisive question is whether in each instance title to the coal passed at Boothton, or not until the coal was put on board at Mobile. It is to be determined, as both parties agree, on the Alabama Sales Act, Ala.Gen.Acts 1931, p. 570, as interpreted by the Supreme Court of that state. Under the Alabama statute, which is the Uniform Sales Act, the passing of title depends on the intention of the parties as gathered from the writings, from such oral agreements relating to the matter as may be admissible, and from the surrounding circumstances. The evidence in the record on this point has been supplemented by the Chamberlin deposition taken under rule 14. The objections to the deposition are not of sufficiently substantial character to require that it be struck out or essentially limited. The contract was silent on such indispensable details as places and amounts of deliveries under it. It was clearly the intention of the parties that it should be supplemented from time to time by oral or written orders. In each of the instances before us such orders were given, the coal company being instructed by the Munson Line to furnish a stated amount of coal at a certain place and date for bunkering a designated steamer. The coal company accepted the orders as part of its contract and sent the coal to its own consignee at the place of delivery with orders to have it trimmed into the designated vessel's bunkers. Whether the basic contract required the coal company to do this we need not speculate. In each instance be fore us, the orders were given and accepted as part of the contract.
The case is governed, we think, by section 19, rule 5, of the Alabama Sales Act. "Rule 5. If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place [italics supplied], or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the placed agreed upon." Gen. Acts Ala.1931, p. 575. On the facts stated, as to which there is no dispute, it seems clear that the seller undertook as part of the contract to deliver the goods at a particular place; that the title remained in the seller until the coal was put on board the steamer; and that the coal was therefore furnished to the steamer by the coal company, not by the Munson Line as the District Judge held. This view is strongly supported by the agreement between the coal company and the Bay City Company under which the latter took and disposed of any surplus coal not required by the steamer, and by the entire failure of the Munson Line to make any arrangements for shipping the coal to Mobile and having it trimmed into the bunkers. As has been said, the contract contained no provision relating to delivery except in connection with fixing the price. Similar provision have been held not to govern the passing of title.
The facts in the Piedmont Case relied on by the District Judge were substantially different. There the coal was delivered in bulk at the seller's wharf. In the opinion it is stated, "No coal was delivered by the Coal Company directly to any vessel; and it had no dealings of any kind concerning the coal directly with the officers of any vessel." 254 U.S. 1, 6, 41 S.Ct. 1, 2, 65 L.Ed. 97. "There was no understanding between the companies * * * when the coal was delivered that any part of it was specifically for any one of the *735 several vessels libeled." "At each plant both the vessels and the factory were from time to time supplied with coal from the same bins; but the greater part of the coal supplied from each plant was used by the vessels." 254 U.S. 6, 7, 41 S.Ct. 1, 2, 65 L.Ed. 97. In the present case, the master of a particular vessel requisitioned for coal to the coal company; it was sent to a particular vessel, loaded on her by the coal company's representative and paid for by her master by drafts on the charterer to order of the coal company.
Under the lien statute, 46 U.S.C.A. § 972, it is presumed that one properly intrusted with a vessel has authority to procure supplies on the pledge of the vessel, and a lien arises unless authority to do so is expressly withheld and the furnisher knew of such limitation of authority or by diligence could have discovered it. The Anna E. Morse, 3 Cir., 286 F. 794, certiorari denied The Anna A. Moore, 262 U.S. 759, 43 S.Ct. 705, 67 L.Ed. 1219; The South Coast, 251 U. S. 519, 40 S.Ct. 233, 64 L.Ed. 386. The charter in the present case contained no such limitation. See U.S. v. Carver, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361. The form in which the coal was billed shows an intention to hold the vessel as well as her owners. It is well settled that a supplyman does not waive his lien on the vessel by also relying on the credit of the owner or charterer. Piedmont & George's Creek Coal Company v. Seaboard Fisheries Co., 254 U.S. 1, at page 10, 41 S.Ct. 1, 3, 65 L.Ed. 97. We think that the District Judge fell into clear error in the holding that the title to the coal passed to the Munson Line at Boothton and consequently that no lien arose. Nothing which was done after the delivery of the coal amounted to a waiver of the lien.
As to laches, the coal was furnished as has been said on two occasions, viz., on November 22, 1933, and May 8, 1934; the libel was filed on November 24, 1934, a year after the first coaling and six months after the second. The Munorway left the United States about 9 days after her last coaling. There is evidence that she returned to this country before the voyage on which she was libeled on these proceedings. In the interval, she had been sold to an innocent purchaser.
The purpose of the maritime lien is to enable a vessel to obtain supplies or repairs necessary to her continued operation by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more formal security given. It is of the very essence of the lienor's rights that they shall not be slept upon. Being undisclosed and cutting under titles subsequently acquired in good faith and without notice of them, a high degree of diligence is demanded in their enforcement. There is no federal statute of limitation on maritime liens; the question is in each case whether such diligence was shown. "The period of limitation of liens in admiralty as against a bona fide purchaser, is `a reasonable opportunity to enforce them.'" Brown, J., The Lyndhurst, D.C., 48 F. 839, 840. It is, within certain rather narrow limits, a question of fact in each case. In The Lyndhurst, supra, a libel for supplies which was filed just within a year after the furnishing was held barred by laches, it appearing that the vessel had always been in or near her home port and that she had been sold to bona fide purchasers. In some of the old cases it was considered that permitting a vessel to go abroad after the lien had been acquired created a presumption that the lien had been waived. The Utility, 28 Fed.Cas. p. 854, No. 16,806. But this view does not appear to have obtained in recent years, 26 Cyc. 794, note 62. Judge Brown apparently regarded a year as the maximum for a vessel constantly in home waters, as against bona fide purchasers. Absence of the vessel from the country operates to relieve the lienor to some extent from the imputation of laches. Cole v. The Atlantic, 6 Fed.Cas. p. 42, No. 2,976; 26 Cyc. 1794, collecting cases.
Applying these principles to the case before us, there was clearly no laches as to the second coaling on May 8. The steamer went abroad from Norfolk 9 days later. The libelant cannot be deemed guilty of laches for not seeking her out and libeling her in the courts of Holland on a claim only a few months old as the claimant contends.
As to the first coaling (November 20, 1933), the question is very close. The Munorway called at various gulf ports of this country half a dozen times between the first coaling and the second. There was unquestionably a reasonable opportunity to enforce the lien. Presumably it was not availed of because the libelant had taken notes of the Munson Line and was collecting on them. It knew or could easily have discovered that the Munorway was *736 held by the Munson Line under charter, not as owner, and that rights of third persons might be affected. The case is similar to The Eliza Jane, 8 Fed.Cas. p. 488, No. 4,363, in which it was held that laches was established because there had been an opportunity, not availed of, to libel the vessel within six months after the supplies were furnished. In Winterport Granite & Brick Co. v. The Jasper, 30 Fed.Cas. p. 373, No. 17,898, a delay of ten months was held too long. We think the libelant cannot be held to have exercised due diligence in enforcing the lien for the first item and that for that item it is not entitled to recover.
The decree of the District Court is reversed and the case is remanded to that court with instructions to enter a decree for the libelant on the item of May 8 with interest and costs and to dismiss the libel as to the item of November 20. The appellant recovers costs of appeal.