THE SALVATOR.

No. 787.

District Court, D. Massachusetts.

Oct. 21, 1940.

MacInnis & Wonson and J. M. Marshall, all of Gloucester, Mass., for libellant.

Thomas H. Walsh, of Boston, Mass., for claimant.

FORD, District Judge.

This is a suit in admiralty in which the libellant seeks to enforce a maritime lien against the Gas Screw Salvator for netting furnished the latter in the amount of $290.40, with interest. The main defense is that the lien was lost through laches.

### Findings of Fact.

On July 3, 1936 one Joseph Ponzo, Jr., was the owner of the vessel Salvator and on that date there was delivered to the Salvator by the libellant, as a result of Ponzo's order, a certain quantity of white netting for use in the repair of seines employed in mackerel fishing. That $290.40 was a fair price for the supplies and that the libellant was entitled to a maritime lien on the vessel was not contested, 46 U.S.C.A. § 971.

Between the dates, July 3, 1936 and August 3, 1938, Ponzo used the vessel in and out of the harbors of Gloucester and Boston, Massachusetts. When Ponzo was not actually employed fishing, the boat was tied up to the Packard Pier in Boston harbor. At other times it was tied up at "T" Wharf, in Boston harbor.

On July 29, 1938 Ponzo made a common-law assignment for the benefit of creditors and recorded it in the City Clerk's Office, City of Boston. The libellant was named therein as one of the creditors. On August 1, 1938 the libellant received a notice from one Cieri, who was counsel for Ponzo, the owner, requesting the assent of the libellant to the assignment. On advice of counsel the assent of the libellant was withheld. Charles L. Perriello was named as assignee in the assignment, and on August 3, 1938 Ponzo executed a bill of sale of the Salvator to Perriello, and the latter on the same day sold the Salvator, through a licensed auctioneer at public auction, to one Tringale, of Boston, Massachusetts. The libellant was notified that a sale was to take place and also received information the sale had been made to Tringale a few days after the auction. These sales were recorded in the office of the Collector of Customs, at Boston, on August 16, 1938, Ship Mortgage Act, 46 U.S.C.A. § 921.

After Tringale bought the boat it was tied up to his wharf at East Boston until sometime in the early part of October when it was hauled out of the water onto a railway in Tringale's yard. The boat remained in the yard until about two weeks after November 23, 1938. On November 23, 1938 Tringale sold the boat to the claimant for a substantial consideration, and this sale was duly recorded with the Collector of Customs, at Boston, on the same day. A former treasurer of the claimant testified, and I find it to be a fact, that when the boat was purchased the claimant was represented by one Harris, a lawyer, for the purpose of examining the title. After some repairs were made, the boat was again placed in the waters of Boston harbor, this time at Federal Wharf. From this latter wharf the claimant used the boat in and about Boston harbor for salvage operations up to the time of its arrest, March 31, 1939.

The existence of a lien was not mentioned in the bill of sale to Tringale nor in that to the claimant, and I find as a fact that the claimant had no knowledge of a lien up to the time the vessel was arrested.

There was no evidence that the libellant, between the dates, July 3, 1936—when the lien attached—and September 8, 1938, made any effort whatsoever to enforce its lien against the vessel. On the latter date the proctors for the libellant drew the present

libel in accordance with instructions received a few weeks earlier and forwarded it to the libellant for verification. The libel was returned immediately, and the proctors, on September 13, 1938, requested information as to the whereabouts of the vessel. In answer to this inquiry, the libellant on September 16, 1938 wrote that the vessel was tied up at Tringale's boat yard in East Boston, where it stated it had been since its sale to Tringale. At this time, as stated above, according to Tringale, it was in the water adjacent to his boat yard, not having been hauled up out of the water until early in October. Nothing further was done at this time by the proctors in the direction of enforcing the lien. On November 7, 1938 the libellant was again asked for information as to the whereabouts of the vessel. At this time the libellant sent out one of its agents to discover the vessel's location and it was found that the boat had been hauled up in Tringale's yard. Later, this agent learned that the boat was being used by the claimant in salvage work near the entrance to Boston harbor. As appears above, it was engaged in this work beginning about two weeks after November 23, 1938, and was in and out of Boston harbor.

The libel was not filed until January 27, 1939, more than two years and six months after the lien attached. The warrant and monition did not issue until March 31, 1939, and, as stated above, the arrest of the vessel was made on March 31, 1939.

### Conclusions of Law.

█ It has been stated repeatedly, as a matter of law, that a holder of a maritime lien cannot sleep on his rights and enforce it against a vessel when the vessel has passed into the hands of a bona fide purchaser who had no knowledge of the lien and had no reasonable opportunity to learn of it. The Grace Darling, D.C., 18 F.2d 587. It requires no lengthy discussion to conclude that that is the case here. The court in The Everosa, 1 Cir., 93 F.2d 732, 735, in dealing with the defense of laches in a maritime lien case, stated: "The purpose of the maritime lien is to enable a vessel to obtain supplies * * * by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more formal security given. It is of the very essence of the lienor's rights that they shall not be slept upon. Being undisclosed and cutting under titles subsequently acquired in good faith and without notice of them, a high degree of diligence is demanded in their enforcement. There is no federal statute of limitation on maritime liens; the question is in each case whether such diligence was shown. 'The period of limitation of liens in admiralty as against a bona fide purchaser, is "a reasonable opportunity to enforce them."' Brown, J., The Lyndhurst, D.C., 48 F. 839, 840. It is, within certain rather narrow limits, a question of fact in each case." Young v. The Key City, 14 Wall. 653, 20 L.Ed. 896; The Grace Darling, supra; The Prilla, D.C., 21 F. Supp. 383; The Admiral, Fed.Cas. No. 84.

█ There is no question here that the claimant was a bona fide purchaser and was ignorant of the existence of a lien. The boat was constantly in and out of Boston harbor from the date the lien attached until the date of the arrest, March 31, 1939, almost three years. The libellant, by the exercise of proper diligence, could have enforced its maritime lien. For some unexplained reason it did not even attempt to take any steps to enforce the lien until shortly before September 8, 1938—about two years and three months after the lien attached. From that time on, up to the time of the arrest of the vessel on March 31, 1939, either through its own neglect or the neglect of its attorneys, it was also dilatory in enforcing the lien.

█ The question as to whether or not the claimant had reasonable opportunity to learn of the lien remains. The abstract and certificate of record of title, at the Custom House, Boston, reflected the fact that the bill of sale to Perriello conveyed the property to him as "assignee". Nothing further appeared. It is the contention of the libellant that the claimant was put upon notice that this was a common-law assignment for the benefit of creditors and that it, or its attorney, should have communicated with Perriello, the assignee, and if it had done so would have learned of the claim of the libellant.

█ The answer to this is that even if the claimant, or its attorney, made the inquiry of Perriello, it would have been discovered that the transaction upon which the libellant relies to establish its lien was almost two years and six months old. This fact would hardly lead any reasonable person to believe that a maritime lien still existed in connection with that claim. A court of admiralty will refuse its aid in the

enforcement of a lien if a court of equity would do so.

As I view the facts and circumstances peculiar to this case, in view of the laches of the libellant especially after it had actual knowledge of the assignment for the benefit of creditors and long before the claimant made its purchase of the boat, all the equity present is in favor of the claimant, a bona fide purchaser for value without notice.

Libel dismissed, with costs.