872 F.2d 554
 1989 A.M.C. 1537
 BERMUDA EXPRESS, N.V., Southeastern Maritime Company, Port
Stevedoring Company, Inc., Ryan-Walsh Stevedoring Company,
Inc., NRS Financial Corp., Assignee of Malone Marine Group,
Inc., Zalesky, Marvin d/b/a Seaside Marine Supply of
Houston, Charles L. Molho, d/b/a Manhattan Ship Supply and
Thurmond Supply Co., Inc.
v.
M/V LITSA (EX. LAURIE U) In Rem, Appellant.
 No. 88-1362.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 6, 1988.
Decided April 13, 1989.
Rehearing and Rehearing In Banc Denied
May 9, 1989.
 
 Donald F. Mooney (argued), New York City, Douglas H. Riblet, Rawle & Henderson, Philadelphia, Pa., for appellant.
 Faustino Mattioni, Francis X. Kelly (argued), Mattioni, Mattioni & Mattioni, Ltd., Philadelphia, Pa., for appellee, Southeastern Maritime Co.
 Thomas E. Seus (argued), Amy L. Currier, Kelly, Harrington, McLaughlin & Foster, Philadelphia, Pa., for appellees, Port Stevedoring Co., Inc. and Ryan-Walsh Stevedoring Co., Inc.
 Before SLOVITER and BECKER, Circuit Judges, and BARRY, District Judge*.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 ISSUES
 
 1
 The appellant vessel in an in rem action appeals from the district court's final adjudication and judgment awarding three stevedoring companies the full amount of their claims based on maritime liens for unpaid invoices for stevedoring services provided to the vessel before it was sold to its present owner. The principal issue on appeal is whether the claims of the stevedore lienors were barred by the equitable doctrine of laches. The conflicting interests involve, on one hand, those of maritime lienors whose services are essential for the smooth functioning of maritime commerce and, on the other hand, those of bona fide purchasers in good faith of vessels which may be subject to such liens. We must also decide the scope of "necessaries" which give rise to maritime liens under 46 U.S.C. Sec. 971 (1982).
 
 II.
 FACTS
 
 2
 Most of the facts relevant to this appeal are not in dispute. Appellees, Port Stevedoring, Inc. (Port), Ryan-Walsh Stevedoring Company (Ryan-Walsh), and Southeastern Maritime Company (Semco), are in the business of supplying stevedoring services to vessels at various ports in the southern portion of the United States. In 1982, Uiterwyk Corporation (Uiterwyk), the general agent for Uiterwyk Lines, Ltd. which owned the vessel, contracted with appellees to provide stevedoring services for vessels nominated by Uiterwyk. This contract covered the vessel involved in this litigation, then known as the M/V LAURIE U, which sailed under Liberian registry. The contracts all called for payment of 80% of the amount due for services rendered upon completion of such services for each vessel and presentation of an invoice. Under the Port and Semco contracts, the balance became due a reasonable time after presentation of duly documented bills, while under the Ryan-Walsh contract final payment was due within sixty days after the presentation of such bills.
 
 
 3
 Semco provided services to the M/V LAURIE U on May 27 and 28, 1982 in Charleston, giving rise to a claim of $22,184.87. Ryan-Walsh provided services to the M/V LAURIE U on July 26-August 6, 1982 in New Orleans, giving rise to a claim for $25,404.21. Port provided services to the M/V LAURIE U in Houston on three occasions in 1982, May 13-23, August 11-14, and October 14-20, giving rise to claims for $112,994.71, $46,692.26, and $71,873.97 respectively.
 
 
 4
 On October 21, the M/V LAURIE U left United States waters and did not return until April 2, 1983. In the interim, two significant events took place. On December 8, 1982, Uiterwyk Lines, Ltd. sold the M/V LAURIE U to Star Warrant Shipping Corp. (Star), a shipping company operating out of Piraeus, Greece. In the contract of sale, Uiterwyk Lines, Ltd. warranted to Star that there were no maritime liens against the vessel, and Star's search of the Liberian registry in New York revealed that no claims had been filed against the ship. Star renamed the vessel M/V LITSA. Shortly after the sale, on January 27, 1983, Uiterwyk, the general agent, filed a petition in bankruptcy in the Middle District of Florida.
 
 
 5
 Upon learning of the bankruptcy, appellees filed individual claims in the bankruptcy court and contacted Lloyds Watch of London to determine the status of Uiterwyk vessels which they had serviced. Lloyds informed appellees of the purchase of the M/V LAURIE U and the name change, and continued to track the vessel's movements until it returned to United States waters on April 2, 1983. Bermuda Express, another claimant who has since settled with Star, arrested the M/V LITSA in the Port of Philadelphia on April 6, 1983. The district court had jurisdiction over this suit in admiralty under 28 U.S.C. Sec. 1333 (1982).
 
 
 6
 Appellees intervened as plaintiffs and proceeded to trial against the M/V LITSA on their claims. After a bench trial, the district court determined that all three appellees had acted with the extraordinary degree of diligence required to preserve their maritime liens, and that neither their participation in the bankruptcy proceedings nor their failure to file notice of their maritime liens waived their right to assert those liens. The court entered the following judgments which represent the full amounts of the claims and prejudgment interest: Port, $324,185.31; Ryan-Walsh, $35,588.16; Semco, $31,078.28.
 
 
 7
 The vessel appeals, arguing that the district court erred in its analysis of the laches issue, that its finding of no waiver was clearly erroneous, that some of the claims were not necessaries giving rise to maritime liens, and that the award of prejudgment interest was not warranted.
 
 III.
 LEGAL PRINCIPLES
 A.
 
 8
 Our standard of review on the laches issue has various components. We review factual findings such as length of delay and prejudice under the clearly erroneous standard; we review the district court's balancing of the equities for abuse of discretion; and our review of legal precepts applied by the district court in determining that the delay was excusable is plenary. See Churma v. United States Steel Corp., 514 F.2d 589, 592-93 (3d Cir.1975).
 
 
 9
 The statute governing maritime liens provides that persons supplying various enumerated services or "other necessaries" to a vessel are entitled to a maritime lien on the vessel "which may be enforced by suit in rem." 46 U.S.C. Sec. 971.[1] The statute does not require maritime lienors to file claims of their liens. At common law maritime liens had historically been considered secret liens, good even against a good faith purchaser of a ship without notice of the lien's existence. See Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 12, 41 S.Ct. 1, 4, 65 L.Ed. 97 (1920); G. Gilmore & C. Black. The Law of Admiralty 588 (2d ed. 1975). Both at common law and under the statute, however, maritime liens may be lost by laches in their prosecution. See G. Gilmore & C. Black at 588.
 
 
 10
 In The Bold Buccleugh, 7 Moore, P.C. 267 (1852), the English Privy Council case which serves as the original authority on the issue, G. Gilmore & C. Black at 595, the court enforced a maritime lien against the ship although it had since been sold; the court, however, noted that the lien may be lost "by negligence or delay where the rights of third parties may be compromised." Id. at 285.
 
 
 11
 Shortly thereafter, the United States Supreme Court enunciated a similar principle. In The Key City, 81 U.S. (14 Wall.) 653, 660, 20 L.Ed. 896 (1872), the Court stated that "laches or delay in the judicial enforcement of maritime liens will, under proper circumstances, constitute a valid defence;" that there is no "arbitrary or fixed period of time" for its operation but that the determination that a lienor was guilty of laches would "depend on the peculiar equitable circumstances of that case;" and that "where the lien is to be enforced to the detriment of a purchaser for value, without notice of the lien, the defence will be held valid under shorter time, and a more rigid scrutiny of the circumstances of the delay, than when the [party claiming laches] is the owner at the time the lien accrued."
 
 
 12
 The parties dispute whether a maritime lienor must exercise "extraordinary diligence" in order to preserve a claim against a bona fide purchaser, see McLaughlin v. Dredge Gloucester, 230 F.Supp. 623, 630 (D.N.J.1964); see also G. Gilmore & C. Black at 767 & n. 387, or whether "reasonable diligence" is sufficient, see The Bold Buccleugh, 7 Moore, P.C. at 285 ("where reasonable diligence is used, and the proceedings are had in good faith, the lien may be enforced, into whosesoever possession the thing may come"). While it is possible that the difference in semantics would not be dispositive since diligence by its very nature requires "steady, earnest, attentive, and energetic application and effort," Webster's Third New International Dictionary (1976), we believe that the lienor should be held to a "reasonable diligence" standard. See Merchants & Marine Bank v. The T.E. Welles, 289 F.2d 188, 190 (5th Cir.1961) (applying a reasonable diligence test). The lienor must take such steps as are appropriate under the circumstances. The district court used the standard most favorable to the vessel and found nonetheless that the lienors exercised the "extraordinary high degree of diligence" required to preserve and enforce the liens. App. A at 376. If we conclude that there is the requisite support for a conclusion of reasonable diligence, we are bound to affirm.
 
 B.
 
 13
 Appellant argues that in considering the diligence of the lienors in this case, we need look no further than the analysis used by the courts in the two Everosa cases decided half a century ago. In the first Everosa case, The Everosa (Southern Coal & Coke Co. v. Kugniecibas), 93 F.2d 732 (1st Cir.1937), the libelant, Southern Coal & Coke Company, had provided coal to the vessel at issue on November 22, 1933 and May 8, 1934 for which it had received only partial payment. Shortly after the second coaling, the ship sailed for foreign waters and did not return until November 1934, at which time Southern libeled the ship. Id. at 733-35. While it had been in foreign waters, it was sold to a bona fide purchaser.
 
 
 14
 The district court found for the ship against the lienor on both claims on the ground that no lien arose, a holding rejected by the court of appeals. The appellate court then considered the ship's laches defense, apparently as a matter of first impression, and held that laches did not bar enforcement of the lien for the second coaling because the ship left the United States nine days after the coaling and "[a]bsence of the vessel from the country operates to relieve the lienor to some extent from the imputation of laches." Id. at 735. Although the court noted that there was evidence that the ship had returned to this country before the voyage on which she was libeled, id., it nonetheless held "there was clearly no laches." Id.
 
 
 15
 The question of the enforceability of the lien for the first coaling was, the court noted, "very close." Id. It concluded that that lien was barred by laches because the ship had "called at various gulf ports of this country half a dozen times between the first coaling and the second," and thus the lienor "unquestionably" had "a reasonable opportunity to enforce the lien." Id. The court also noted that the lienor "knew or could easily have discovered" that the vessel at the time of the coalings was held by the party receiving the coal under charter and not as owner, "and that rights of third persons might be affected." Id. at 735-36.
 
 
 16
 The second Everosa case, The Everosa (Swan & Sons v. Kugniecibas), 20 F.Supp. 8 (E.D.N.Y.1937), involved claims filed by companies which had supplied the vessel in Norfolk, Virginia, in February 1934 and in New Orleans in April 1934 before it sailed for foreign waters in May 1934. In this case, however, the lienors did not file their libels until 1937, although the ship had returned to United States waters twice in the interim. The court held that inasmuch as the company supplying the vessel at Norfolk had an opportunity to enforce its lien when the vessel returned to Norfolk in May 1934 before it sailed abroad, and that the creditors (including the libelant) were notified of the bankruptcy proceeding of the operator which was initiated in June 1934, see id. at 11, both of which events were prior to the transfer of title of the ship in August 1934, the balance of equities required dismissal of the libel.[2] On the other hand, the court held that the second lienor was not barred by laches because the ship sailed abroad within a month of its supply services, and, although the ship returned to the United States at various times, it did not return to New Orleans during those visits. It held that failure to take advantage of those opportunities for affirmative action "does not fatally portray lack of diligence." Id. at 13.
 
 
 17
 Appellant urges that the Everosa cases mandate a finding that Semco, Ryan-Walsh, and Port did not exercise the requisite diligence in enforcing their liens. Although some of the facts in the Everosa cases are analogous to the M/V LAURIE U situation, all of the cases stress that the question of due diligence is one peculiar to the facts of each case. For this reason, it is not particularly useful to review the facts of the many other cases referred to by appellant and the distinguishing factors pointed out by appellees. We accept the legal principles from the Everosa cases that lienors are not required to attempt to enforce their liens in foreign waters and that the existence of a reasonable opportunity for the lienor to arrest the vessel before the purchase is an important factor in the laches analysis.
 
 
 18
 However, the fact that it would have been possible or even feasible to locate and arrest the vessel at a port in the United States is not dispositive of the question of whether or when the appellees in this case should have done so. The custom of the shipping industry, for example, must also inform the analysis of what constitutes diligence under the circumstances of a given case.
 
 
 19
 The arrest of a vessel is a remedy of last resort, and one which has the potential to seriously disrupt the flow of maritime commerce. Therefore, we decline to establish a firm rule which would require a maritime lienor to arrest a vessel, particularly if there are available other reasonable methods, consistent with industry custom, to secure payment. The relevant consideration instead is what would have been the commercially reasonable practice. Components of diligence thus include industry custom, the amount of the lien, the pattern of dealing between the parties, and whether the lienor had information that the interests of a third party would likely be adversely affected by its failure to act.
 
 
 20
 Appellant argues that we should also consider whether the lienors filed their claims on the ship's register. It claims that the lienors' failure to file claims of their liens on the Liberian Registry in New York, a relatively simple and inexpensive means of giving notice, evinces a failure of the lienors to exercise the requisite degree of diligence.
 
 
 21
 Several cases have treated failure to record a claim of lien as a relevant factor in assessing the equities of a laches defense. See, e.g., Tagaropulos, S.A. v. S.S. Santa Paula, 502 F.2d 1171, 1172 (9th Cir.1974); John W. Stone Oil Distributor, Inc. v. M/V Miss Bern, 663 F.Supp. 773, 780 (S.D.Ala.1987); Dixie Machine Welding and Metal Works, Inc. v. M/V Andino, 1983 A.M.C. 1166, 1168 (S.D.Fla.1982); Waterways Marine, Inc. v. Brooks Liquid Transport, Inc., 291 F.Supp. 703 (N.D.Ill.1968). Each case, however, has its own set of facts and no situation directly parallels the one before us.
 
 
 22
 All parties agree that there is no statutory requirement that a maritime lien be filed in order to be valid.[3] At the time Congress enacted the Maritime Liens Act, it could have but failed to require filing. It has made no attempt to change the statute in this respect since then. The district court thus concluded that the lienors here did not lack diligence "merely because the claims were not filed with the Liberian Ship Registry in New York." App. at 376 (emphasis added). Obviously, however, the ability to have filed the lien is a consideration that cannot be completely ignored in the relevant balancing. It is significant whether it was a custom of the industry to record liens for necessaries.
 
 
 23
 Poised against the diligence or lack thereof of the lienor is the action of the purchaser of the vessel. A balancing of the equities requires consideration not only of the bona fides of the purchaser, i.e., its lack of actual knowledge of unpaid liens and its search of the ship's registry, but also of its efforts to ascertain whether, in light of the absence of any legal requirement of filing liens, there are in fact liens outstanding. See Tagaropulos S.A. v. S.S. Santa Paula, 502 F.2d 1171, 1172 (9th Cir.1974) (Purchaser "made every effort to unearth all claims against the ship." It checked both the home port and ship's log for liens; although no liens were entered in the log, purchaser discovered entries for repairs, contacted shipyards and learned of outstanding unpaid bills).
 
 
 24
 Finally, we note that it is for the district court in the first instance to perform the equitable balancing of all the relevant factors. Our review will be facilitated if the district courts fully discuss the factors considered on the issue of diligence and make explicit their balancing of the equities in reaching a decision on laches. We thus proceed to examine the record to discern the factors which explicitly or implicitly informed the district court's judgment in this case.
 
 C.
 
 25
 An exhibit introduced in evidence shows that the vessel was not in a United States port during the entire period from October 21, 1982 until April 2, 1983.[4] The appellees learned of Uiterwyk's bankruptcy proceeding shortly after it was commenced, and they acted to enforce their liens within days of the vessel's subsequent return to United States waters. The initial inquiry relevant to appellees' diligence is thus whether they had a reasonable opportunity to enforce their liens between the time each lien arose and October 21, 1982, when the ship left United States waters.
 
 
 26
 Patently, Port could not have taken any action in United States waters to enforce its third lien, that based on the services it provided between October 14-20, 1982, because the vessel left the United States immediately thereafter. Semco and Ryan-Walsh, on the other hand, had provided their services earlier. However, throughout the entire period following the services provided by Semco in Charleston (May 27 and 28) and by Ryan-Walsh in New Orleans (July 26--August 6), the vessel was out of the country except for two Houston stops (August 9-14 and October 14-21) and one stop at Port Arthur, Texas (October 9-14). If we look to the vessel's return to the particular port where the stevedoring company provided the services, which was the dispositive factor leading the court to determine that laches did not bar one of the claims in the second Everosa case, 20 F.Supp. at 13, we note that the vessel did not return to Charleston or New Orleans following the provision of services by Semco and Ryan-Walsh at these ports.
 
 
 27
 We are aware, as appellant argues, that modern technology associated with the shipping industry has made it easier than in the Everosa period for lienors to track ships, thus increasing opportunities to arrest vessels and enforce liens. Nonetheless, we cannot rule on the record developed by the appellant here that the stevedore companies had the obligation to track the vessel, which primarily served foreign ports throughout this entire period, to the Texas ports and arrest the ship on one of the three occasions when it would have been possible to do so.
 
 
 28
 It is true, as appellant argues, that these companies could have easily filed their liens on the ship's registry and thereby given notice to a prospective purchaser. However, we have pointed out that there is no legal requirement for such an action and, significantly, there was no evidence of an industry custom to do so. In fact, appellant's expert, although testifying that he advises his clients to record their liens, conceded that "as a practice and custom ... there are claims for which liens have not been registered." App. A at 353.
 
 
 29
 Appellant notes that there is evidence signifying that at least some of the appellees knew of Uiterwyk's poor financial condition.[5] Appellant, however, has produced no evidence that appellees were actually aware of the impending bankruptcy or the forthcoming sale of the vessel at a time when they still had opportunities to execute on their liens. Appellees' failure to enforce the liens was consistent with their past practice in dealing with Uiterwyk, which was a slow payer. Previously, their demands for payment and threats to arrest vessels were sufficient to procure payment, albeit belatedly. Appellant has not shown it was commercially unreasonable of appellees to wait for payment. In light of these circumstances, we find no basis to question the district court's conclusion that these lienors exercised the requisite diligence with respect to their liens and that Port exercised such diligence with respect to its October lien.[6]
 
 
 30
 It is more difficult to evaluate Port's diligence in the case of its two earlier liens, that arising from its May services and that arising from its August services. Port clearly had the opportunity to take action against the ship because it returned to Houston where Port provided additional services notwithstanding the unpaid bills. In both instances Port extended further credit for new services.
 
 
 31
 However, Port's liens were only five months and two months old at the time the ship left United States waters. In many of the relevant cases the liens had been outstanding for substantially over a year before the lienor sought enforcement. See Tagaropulos, S.A. v. S.S. Santa Paula, 502 F.2d 1171, 1172 (9th Cir.1974) (two years); Phelps v. The Cecelia Ann, 199 F.2d 627, 628 (4th Cir.1952) (more than two years); The John Cadwalader, 99 F.2d 678, 679 (3d Cir.1938) (five to nine years); Dixie Machine Welding and Metal Works, Inc. v. M/V Andino, 1983 A.M.C. 1166 (S.D.Fla.1982) (two and one-half years).
 
 
 32
 Appellant has shown little that Port could have done short of the draconian measure of arresting the ship, with the exception of filing the lien which we have noted is not required as a matter of law. Appellant introduced no evidence of other commercially reasonable practice available to Port. Port's Vice-President testified that it was not customary for Port or any other stevedoring company to require advance payment before it rendered services. App. A at 261. Moreover, Port was receiving payments from Uiterwyk through 1982. While it did not receive any payment which was applied to the invoices for this particular vessel, it did receive $100,000 from Uiterwyk on November 10, 1982 which was applied to older bills, App. A at 264, thus giving it reason to believe that it would eventually be paid. Therefore, we cannot conclude that Port was guilty of a lack of diligence that would deprive it of its maritime lien.
 
 
 33
 Under these circumstances, we need not consider whether there were some steps that Star, a sophisticated shipowner which purchased over 70 vessels, could have taken to protect itself which it failed to take, such as the inquiry of the general agent or of the port agents and suppliers in the ports that the vessel had visited. See Tagaropulos, 502 F.2d at 1172.
 
 
 34
 It was the function of the district court to make the balance between the actions of the lienors and the new purchaser. In the few cases that have reached a court of appeals, the appellate courts have tended to rely on the trial court's judgment. See, e.g., Tagaropulos, 502 F.2d at 1171; Phelps v. The Cecelia Ann, 199 F.2d 627 (4th Cir.1952); see also Gardner v. Panama Railroad Co., 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951) (issue of laches is one primarily addressed to the discretion of the trial court). Although it is possible that we would not have decided the issue as did the district court, we cannot hold that it abused its discretion in balancing the equities as it did in concluding that these claims were not barred by laches.[7]IV.
 
 NECESSARIES
 
 35
 Under the Maritime Liens Act, a lien is provided for "[a]ny person furnishing ... necessaries, to any vessel." 46 U.S.C. Sec. 971 (emphasis added). The term "necessaries" has been interpreted broadly to include all services which will facilitate operation of ships. See Farwest Steel Corp. v. Barge Sea-Span 241, 769 F.2d 620, 623 (9th Cir.1985) ("[t]he term 'necessaries' under section 971 refers to 'supplies which are necessary to keep the ship going,' " quoting Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 280, 60 S.Ct. 937, 943, 84 L.Ed. 1197 (1940)); Farrell Ocean Services, Inc. v. United States, 681 F.2d 91, 92-93 (1st Cir.1982).
 
 
 36
 Stevedoring services have generally been treated as necessaries within the meaning of section 971, see, e.g., Universal Shipping, Inc. v. Panamanian Flag Barge, 563 F.2d 483 (1st Cir.1976), and appellant acknowledges that stevedoring services give rise to a maritime lien. It argues, however, that some of the charges on appellees' invoices are not "necessaries". Specifically, it objects to "charges for overtime, container royalties, Guaranteed Annual Income contributions, vacation, pension and welfare portions of charges for labor, extra labor for truck drivers, moving containers, and commissions for soliciting freight" on the ground that these charges do not relate to services actually provided to the vessel. Appellant's Brief at 45.
 
 
 37
 It is undisputed that most of the items to which appellant objects represent payments which the stevedoring companies are required to make to the stevedores under the applicable collective bargaining agreements. As such, they are part and parcel of the cost of stevedoring services and are passed on to the owner of a vessel. It is an economic fact of life on the waterfront that if these payments are not made, the vessel will be unable to obtain the stevedoring services which are required for the operation of any cargo bearing ship. See Atlantic and Gulf Stevedores, Inc. v. M.V. Rosa Roth, 587 F.Supp. 1033, 1035 (S.D.N.Y.1984). Therefore, we hold that the maritime lien for necessaries under 46 U.S.C. Sec. 971 encompasses those payments covered by the vessel's contract for services which stevedoring companies must pay to the stevedores pursuant to the terms of a collective bargaining agreement.
 
 
 38
 In this case, the district court required payment of additional items which are not covered by a collective bargaining agreement. Semco's claim includes $2,687.10 in manifest and booking commissions for services performed by Semco as its agent in procuring cargo and collecting freight charges. We need not decide whether cargo itself is a necessary under section 971, see The Majestic II, 285 F. 91 (S.D.Fla.1922) (supplier of cargo for resale did not have maritime lien against vessel which carried the cargo), because we believe that in any event it is unreasonable to include commissions for solicitation of freight and provision of financial services as necessaries. Accord E.S. Binnings, Inc. v. M/V Saudi Riyadh, 815 F.2d 660, 663 (11th Cir.1987). Such commissions are outside the realm of stevedoring maritime contracts and cannot be the subject of a maritime lien.
 
 
 39
 The support documents for Semco's claim also included a bill for $160.00 for moving chassis, which are the frames used to move large shipping containers around pier areas. Use of chassis in connection with loading cargo on and off vessels has been held to be a necessary giving rise to a maritime lien. See Itel Containers International Corp. v. Atlanttrafik Express Service, Ltd., 668 F.Supp. 225, 229 (S.D.N.Y.1987) (chassis leased in excess of those actually used on board ship were necessaries within meaning of Sec. 971). In this case, however, Semco's own witness testified that the bill in question was just for moving chassis and had "nothing to do with stevedoring." App. A at 124. To the extent this component of Semco's claim and any other components of the other appellees' claims represent charges for movement of chassis for purposes not directly related to loading or unloading the vessel, they are not necessaries giving rise to maritime liens.
 
 
 40
 It is unclear from the record before us whether there are additional items of the asserted claims which were not required by the collective bargaining agreement or which were not necessary to facilitate the use of the vessel. On remand, the district court should adjust any amount which is not consistent with the above analysis. We assume the parties can agree on these issues, but if they fail to do so, the district court may conduct such additional proceedings as required.
 
 V.
 PREJUDGMENT INTEREST
 
 41
 Appellant contends that the district court abused its discretion in awarding prejudgment interest. The award of prejudgment interest in admiralty cases for compensatory purposes is within the trial judge's discretion, and we have held that such interest is to be denied only in exceptional circumstances. See In re Bankers Trust Co., 658 F.2d 103, 108 (3d Cir.1981), cert. denied, 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982). Appellant has not pointed to any exceptional circumstances such as bad faith by the appellees or delay in prosecution of their claims which would preclude such an award. Id. We find no abuse of discretion in this respect in the award of prejudgment interest.
 
 VI.
 CONCLUSION
 
 42
 We recognize that it may appear inequitable to permit enforcement of maritime liens against a purchaser without notice of those liens, particularly when giving notice through registration of the liens is a simple matter. However, whether such registration should be imposed as a requirement for the ability to satisfy liens against a ship when it has been acquired by a subsequent purchaser is a policy decision that is more appropriately made by Congress than by the courts. The judicial decision on a laches defense must be made without interposition of our view as to what the law should be.
 
 
 43
 In this case, we cannot say that the outstanding liens were so long overdue that, in the circumstances here, the district court was obliged to hold that they could not be enforced. We will, therefore, defer to the district court's exercise of its discretion, and we will affirm its judgment in all respects except that we will remand for the purpose of its reconsideration of the items which may appropriately be considered as necessaries under the Maritime Liens Act in accordance with our discussion above.
 
 
 
 *
 Hon. Maryanne Trump Barry, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 The text of the relevant statute provides in full that:
 Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.
 46 U.S.C. Sec. 971.
 
 
 [2]
 In this case, unlike in the first Everosa case, the court stated that the company ordering supplies was both owner and charterer. 20 F.Supp. at 9
 
 
 [3]
 Appellant is somewhat disingenuous in its various references to the International Convention for the Unification of Certain Rules Relating to Maritime Liens and Mortgages, April 10, 1926, 120 L.N.T.S. 187. The significant fact is that the United States is not a signatory, and thus the provisions of the Convention are irrelevant to this case
 
 
 [4]
 The itinerary of the vessel from May 1, 1982 through April 1983 was as follows:
 Time in Port Port
1982
Apr 27May 12 New Orleans
May 13May 23 Houston [Port's services]
May 28May 29 Charleston [Semco's services]
May 30May 31 Hampton Roads
Jun 11 Gibraltar
Jun 14Jun 17 Malta
Jun 18Jun 19 La Goulette, Tunisia
Jun 22Jul 3 Alexandria
Jul 6Jul 7 Malta
Jun 11 Gibraltar
Jul 24Aug 7 New Orleans [RyanWalsh's services]
Aug 9Aug 14 Houston [Port's services]
Aug 29Sep 1 Casablanca
Sep 2Sep 3 Tangier
Sep 10 Alexandria
Sep 18Sep 22 Malta
Sep 25 Gibraltar
Oct 9Oct 14 Port Arthur, Texas
Oct 14Oct 21 Houston [Port's services]
Nov 5Nov 10 Casablanca, Morocco
Nov 11 Gibraltar
Nov 12 El Djazair
Nov 18Dec 1 Alexandria, Egypt
Dec 3Dec 17 Piraeus, Greece
Dec 28Dec 30 Dunkirk, France
1983
Dec 31Jan 5 Rotterdam, Netherlands
Jan 19 Las Palmas, Canary Islands
Jan 27 Abidjan, Ivory Coast
Jan 29 Abidjan
Mar 5 Abidjan
 Apr 2Apr 14 Philadelphia, Pennsylvania
 
 
 [5]
 For example, a Ryan-Walsh memorandum dated September 1, 1982, refers to rumors that Uiterwyk is about to take a "swan dive" and that it should "perhaps consider doing something before the dam bursts." App. B at 15. Uiterwyk checks to Semco bounced in September and October 1982. App. A at 153-56
 
 
 [6]
 At one point in its opinion the district court stated that appellees promptly pursued their maritime liens upon learning of Uiterwyk's bankruptcy proceeding. It is clear from the next sentence, where the court noted that the vessel was arrested within six to eleven months of the stevedoring services rendered by the plaintiffs, App. A at 375, that the court in fact examined diligence from the standpoint of the entire relevant period
 
 
 [7]
 In light of the strong presumption in favor of maritime liens, appellant has not met its burden of proving that appellees deliberately intended to waive their statutory rights to such liens. See Gulf Oil Trading Co. v. M/V Caribe Mar, 757 F.2d 743, 750 (5th Cir.1985); Farrell Ocean Services, Inc. v. United States, 681 F.2d 91, 93-94 (1st Cir.1982). Thus, the district court's finding that appellees did not waive their liens is not clearly erroneous
 We also reject appellant's contention that the claims filed by the appellees as unsecured creditors in the bankruptcy proceeding against Uiterwyk Corp., the general agent, operated to release the maritime liens that the appellees held against the ship. Although we would be concerned were there a double recovery, we were advised at oral argument that there has been no distribution in the bankruptcy proceeding.