Catharine McLAUGHLIN, Administratrix ad prosequendum of the Estate of Hugh J. McLaughlin, deceased, Libellant,

v.

The DREDGE GLOUCESTER, her engines, tackle and appurtenances, Respondent,

and

American Dredging Company, Claimant.

Civ. A. No. 64–64.

United States District Court

D. New Jersey.

June 23, 1964.

Brown, Connery, Kulp & Wille, by George F. Kugler, Jr., Camden, N. J., and Freedman, Landy & Lorry, by Milton M. Borowsky, Philadelphia, Pa., for libellant.

Archer, Greiner, Hunter & Read, by James Hunter, III, Camden, N. J., and Krusen, Evans & Byrne, by James F. Young, Philadelphia, Pa., for claimant.

COHEN, District Judge.

This is a Libel in Admiralty, in which the chronology is significant. On September 21, 1957, libellant's decedent, while an employed crewmember of respondent dredge "Gloucester", formerly the "Queen", sustained personal injuries upon the dredge, when upon the navigable, territorial waters of the State of New Jersey. The seaman's death ensued ashore from these injuries on November 25, 1957.

On June 15, 1959, the present libellant commenced a civil action in the United States District Court for the Eastern District of Pennsylvania against Eastern Engineering Co., Inc. (Eastern), operator of the dredge at the time of the injury, based upon negligence and failure to provide a seaworthy vessel arising out of the foregoing events, which also form the narrative of the first cause of action in the present libel. The aforesaid action resulted in a verdict for the plaintiff in the amount of $40,000.00, upon which judgment was entered March 28, 1963.

On January 16, 1964, libellant, the widow and administratrix *ad prosequendum* of the estate of Hugh J. McLaugh-

lin, the deceased seaman, commenced a suit on the Admiralty side of this Court, proceeding *in rem* against respondent, the dredge "Gloucester", for money damages by reason of personal injuries and resultant death to her decedent. The libel contains two causes of action, the first of which alleges "unseaworthiness" of respondent, and negligence of its then owner and the operator Eastern, a subsidiary corporation of the owner, as the gravamen of its present claim for damages. The second cause of action asserts claim to a maritime lien against the respondent dredge based upon the earlier judgment against Eastern, and the judicial relief now demanded is that the dredge be condemned and sold by this Court to satisfy the prior judgment.

The claimant, American Dredging Company, having purchased the offending dredge on August 19, 1960, from Brann and Stewart Co., the owner at the time of the occurrence in question, without notice of any maritime lien, filed exceptions to the libel, making claim for release of its dredge, together with damages, interest and costs for deprivation of use since attachment.

The claimant now moves this Court to dismiss the libel for failure of its allegations to support this action in admiralty, urging that any maritime lien which may have existed against the respondent dredge was extinguished by the judgment obtained against the former operator Eastern; and further, that any cause of action libellant might have had has been barred by the relevant statutes of limitations, or defeated by the doctrine of laches. The respective contentions, some of which are novel, have been carefully briefed and forcefully presented on oral argument. The Court will endeavor to reach *en masse* the many points deemed to be essential. The disposition of claimant's motion depends, of necessity, upon a determination of whether the libel is maintainable as a matter of law.

At the outset, the relief sought lacks specific designation of authoritative source for remedy and, therefore, must be gauged against the avenues of judicial relief afforded on the Admiralty side of this Court. The Constitution of the United States provides that the jurisdictional power of the United States shall extend to all cases of admiralty and maritime jurisdiction.[1] Congress in 1789, provided that the District Courts of the United States shall also have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, as well as saving to suitors in all cases such rights, if any, as the common law might be competent to afford.[2] This saving of common law remedies by Congress, refers to *in personam* proceedings against a defendant in admiralty and not merely a remedy in a common law court.[3]

The second source of judicial relief in Admiralty is that provided by Congress in Section 33 of the Merchant Marine Act of June 5, 1920, known as the Jones Act.[4] The Jones Act granted to an injured seaman a right of action on the civil side of the federal court, with right of trial by jury; and in the event of death when grounded in negligence, a like right of action to his personal representative on behalf of designated beneficiaries.[5]

The third avenue for relief to which libellant must look in this death action within state navigable, territorial waters, is the pertinent Death by Wrongful Act

---

1. U.S. Constit. Art. III, Sec. 2.

2. Act of September 24, 1789, c. 20 sec. 9, 1 Stat. at L. 73, Jud.Code Sec. 24(3), 28 U.S.C. § 1333.

3. The Moses Taylor, 71 U.S. 411, 4 Wall. 411, 18 L.Ed. 397 (1866); Wunderlich v. Netherlands Insur. Co., 125 F.Supp. 877 (D.C.S.D.N.Y.1954) for an excellent discussion of the compatibility of the two remedial concepts.

4. 41 Stat. 1007, 46 U.S.C. § 688.

5. Gillespie v. United States Steel Corp., 321 F.2d 518, 522 (6 Cir. 1963), a well considered opinion.

Statute [6] and the Survival Statute of New Jersey.[7]

■ Being an action *in rem*, the libel is not maintainable under the provisions of the Jones Act, because not brought by an injured seaman in his lifetime for unseaworthiness of the vessel, which he might have done under general maritime law, as distinguished from negligence *in personam*, nor instituted by his representative for personal injuries based upon negligence *in personam*, as distinguished from unseaworthiness of the vessel.[8] The application of the foregoing distinction in the instant case warrants its precise positioning within the historical overlay of the laws of seamen from which divergent concepts of rights and remedies have evolved.

In the early days of sailing ships, the men before the mast were little more than appurtenances to the vessel.[9] The protection against harm afforded to them by Admiralty Courts was only that they be provided with safe vessels upon which to serve; and when injured, their rights were vindicated by maritime law to the extent of imposing upon the vessel and her owners the obligation of providing "maintenance and cure." However, if the seafarer's injury resulted in his death, under both American and English maritime law, all claims for injury, pain and suffering as well as death, died with the seaman. The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1866).

With the passage of time, and the advent of steam navigation involving the use of complicated machinery on vessels, the seaman could no longer gauge his risk by visual inspection of the ship before signing his articles to serve, as he had done with respect to comparatively uncomplicated sailing ships. In meeting the challenge of the increased hazards to which its wards were being exposed, there developed judicially within the Admiralty Courts the doctrine of "seaworthiness." This doctrine imposed a maritime duty upon the vessel and her owners to provide a safe and sound vessel and equipment, for breach of which the vessel was conclusively deemed to be "unseaworthy", rendering both vessel and owner liable in damages for injury to a seaman as a result thereof. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); The State of Maryland, 85 F.2d 944, 945 (4 Cir. 1936), and Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 544, 80 S.Ct. 926, 930, 4 L.Ed.2d 1941 (1960), in which Mr. Justice Stewart reviews and defines the doctrine of "unseaworthiness" as it developed in the late Nineteenth Century; see also, Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), and Seas Shipping v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). These later authorities not only declare an *in rem* remedy to be available in maritime law for an injured seaman against the vessel

6. N.J.S.A. 2A:31-1 Death by Wrongful Act—"When the death of a person is caused by a wrongful act, neglect or default, such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury, the person who would have been liable in damages for the injury if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured * * *."

N.J.S.A. 2A:31-2 provides for such death action to be brought by the personal representative of the decedent.

N.J.S.A. 2A:31-4 provides for recovery for dependent beneficiaries or heirs at law of decedent.

N.J.S.A. 2A:31-3 "Limitation of Actions. Every action brought under this chapter shall be commenced within 2 years after the death of the decedent, and not thereafter".

7. N.J.S.A. 2A:15-3 "Actions which survive; torts to decedent. Executors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living".

8. Gillespie v. United States Steel Corp., supra; The "Tungus" v. Skovgaard, 357 U.S. 588, 79 S.Ct. 503, 523, 3 L.Ed.2d 524 (1959), 71 A.L.R.2d 1280.

9. See: Dana, Two Years Before the Mast, (1840) An American Classic, for a graphic description of the plight of American seamen in early times.

and owner, but refine the legal distinction between *in rem* liability in Admiralty as a species of absolute liability, or vicarious liability without fault, and an *in personam* proceeding for negligence, or breach of contract, of a vessel's owners, agents or employees.[10]

While the general maritime law extended humanitarian concern to injured seamen, the Courts of Admiralty terminated their jurisdictional power where death resulted to the seaman, much like the common law before statutory innovations. In The Harrisburg, supra, the maritime law was declared to be that, in the absence of a Federal or State statute conferring a right of action therefor, damage actions for the *death of a seaman* caused by negligence could not be maintained in Admiralty in a United States Court; furthermore, in Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686 (1930), such actions were not maintainable whether the death was occasioned by negligence or unseaworthiness, all claims therefor being foreclosed by the demise of the injured seaman.

This harsh maritime law was tempered by the Jones Act, supra, in that it continued the *in rem* cause of action to an injured seaman for personal injury, and created a new cause of action where none had previously existed in marine law for his personal representative to maintain an action on behalf of designated beneficiaries for damages where the seaman's death was the result of negligence. Moreover, where the injury or death was caused, or contributed to, by the violation of a statute or regulation within the doctrine of liability granted to railroad workers under the Federal Employers' Liability Act, the seaman's employer was liable [11] by reason

of these newly created rights being incorporated within the Jones Act.

In Kernan, cited in the margin, Mr. Justice Brennan, speaking for the Court, declared that the Jones Act remedy for wrongful death was exclusive and precluded any remedy for wrongful death within territorial waters based upon unseaworthiness whether derived from federal or state law. However, a year later, in The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 523, 3 L.Ed.2d 524 (1959), 71 A.L.R.2d 1280, an action for damages for death by reason of alleged unseaworthiness of the vessel, and the alleged negligent failure of its owner to provide a reasonably safe place to work, the court held that in an action based on unseaworthiness for a happening within the territorial waters of New Jersey, a court in admiralty would apply a State Wrongful Death Act as encompassing a claim for uneaworthiness where death was caused to a nonseaman. Tungus is distinguishable from the case *sub judice* by precise differences in fact and in law. The federal court was applying the law of the situs of the tort. The United States Supreme Court held maritime unseaworthiness to be within the purview of a tort "caused by a wrongful act, neglect or default", under the State Wrongful Death Act. Consequently, the court was obliged to give effect to the state statute as giving rise to that cause of action which did not in fact involve a seaman, and with like consequence as a matter of law held that the Jones Act was inapplicable.

▇▇▇ In the instant case, decedent was a seaman, and the Jones Act does apply to the exclusion of the New Jersey Wrongful Death Act for death caused by alleged unseaworthiness of the vessel and the negligence of its owner.[12] As

---

10. Compare: Thompson v. Calmar Steamship Corp., Court of Appeals for the Third Circuit, 331 F.2d 657, decided April 15, 1964; petition for rehearing denied per curiam, May 20, 1964, in which Judges Hastie and Smith filed a dissenting opinion regarding what they believed to be the Court's departure from the traditional concepts of "unseaworthiness."

11. Gillespie v. United States Steel Corp., ante.; Kernan v. American Dredging Co., 355 U.S. 426, 428, 78 S.Ct. 394, 396, 2 L.Ed.2d 382 (1958).

12. Gillespie v. United States Steel, ante.; Kernan v. American Dredging Co., ante.

was stated concisely by Senior Judge McAllister in Gillespie, a case closely approximating our own, 321 F.2d 518, at page 528:

> "What the Jones Act established was a modification of the prior maritime law, and a new rule of general application in reference to the liability of owners of vessels for injuries to seamen; it superseded all state legislation on that subject; and the right of action given by the Jones Act to the personal representative to recover damages *for and on behalf of designated beneficiaries* for the death of a seaman when caused by negligence, is exclusive, and precludes a right of recovery of indemnity for the death by reason of the unseaworthiness of the vessel, irrespective of negligence, notwithstanding that right might be predicated upon the death statute of the State in which the injury was received. Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686." (Emphasis in the opinion.)

And further at page 529 of 321 F.2d:

> "The survival provisions of the Jones Act apply to an action brought by the personal representative of a deceased seaman, whose death was occasioned by a shipowner's negligent failure to comply with the absolute duty to furnish a seaworthy vessel."

We conceive such principles of law to govern the instant case. Libellant's decedent lost his right to claim against the respondent dredge, *in rem* when he died; the Wrongful Death Act of New Jersey [13] does not confer upon a personal representative a cause of action for maritime tort for death to a seaman in the instant case, for Congress by the enactment of the Jones Act had preempted this precise area of liability as a matter of federal law.[14]

Libellant stresses her right under the Survival Statute of New Jersey,[15] to recover for the pain and suffering sustained by her decedent in his lifetime as a result of the maritime tort occasioned by the respondent dredge's alleged unseaworthiness in an action *in rem* in admiralty, as distinct from the action for damages due to death. There is a line of cases which gives support to libellant's contention.[16] Survival statutes, in contrast to "wrongful death" statutes, do not create a new cause for action, but rather preserve such right of action as may have accrued to the decedent in his lifetime. Under general maritime law, the seaman had he survived would have been entitled, in addition to his remedies *in personam* under the Jones Act for negligence, to a maritime lien enforceable in admiralty *in rem* against the offending vessel for injury caused by its unseaworthiness. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); The Imperator, 288 F. 372 (5 Cir. 1923). However, in Reed v. S. S. Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), where a longshoreman employed by an independent contractor was injured, the Court through Mr. Justice Black stated at page 412 of 373 U.S., at page 1351 of 83 S.Ct.:

> "We find it unnecessary to decide whether a ship may ever be held liable for its unseaworthiness where no personal liability could be asserted * * *,"

---

13. N.J.S.A. 2A:31–1 ante n. 6.

14. Gillespie v. United States Steel, ante.

15. N.J.S.A. 2A:15–3 ante, n. 7.

16. Kernan v. American Dredging Co., 355 U.S. 426, 430, 79 S.Ct. 394, 2 L.Ed.2d 382 (1958); Holland v. Steag, 143 F. Supp. 203 (D.C.Mass.1956); McLaughlin v. Blidberg Rothchild Co., 167 F.Supp.

714 (D.C., S.D.N.Y.1958); Burns v. Marine Transport Lines, Inc., 207 F.Supp. 276 (D.C., S.D.N.Y.1962); Curtis v. A. Garcia Y Cia, 241 F.2d 30 (3 Cir. 1957); Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941); Sperbeck v. A. L. Burbank & Co., 190 F.2d 449 (2 Cir. 1951); Reed v. S. S. Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963).

the Court finding that barring statutory exemption, a boat charterer is personally liable for unseaworthiness, and that this liability would support a libel *in rem* against the vessel itself, citing for authority, Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 446, 3 L.Ed.2d 413 (1959).

Hence, assuming the libel *in rem* against the offending respondent vessel for personal injuries survived, under the New Jersey statute for pain and suffering due to unseaworthiness as set forth in her first cause of action, there must be considered the affirmative defense of "laches" interposed by claimant as to the timeliness of the libel.

 In Admiralty, the timeliness of a suit based upon unseaworthiness is determined by the equitable doctrine of laches in lieu of a statute of limitations. Claussen v. Mene Grande Oil Co., 275 F.2d 108 (3 Cir. 1960); Oroz v. American President Lines, 259 F.2d 636 (2 Cir. 1958). Laches consists of inexcusable delay in instituting a suit coupled with prejudice to the party against whom the claim is asserted. Taylor v. Crain, 195 F.2d 1963 (3 Cir. 1952); Gardner v. Panama R. Co., 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31 (1951); Loverich v. Warner Co., 118 F.2d 690 (3 Cir. 1941), cert. den. 313 U.S. 577, 61 S.Ct. 1104, 85 L.Ed. 1535. In applying this doctrine, the courts initially will look to analogous statutes of limitations as a guide in ascertaining what might constitute unreasonable delay; and concomitantly, to the circumstances of the particular case in determining whether prejudice may logically be presumed in the absence of an affirmative to the contrary. Claussen v. affirmative showing to the contrary. Claussen v. Mene Grande Oil Co., C.A., supra; Kane v. Union of Soviet Socialist Republics, 189 F.2d 303 (3 Cir. 1951). The pertinent analogous statutes of limitations are R.S. 2A:14–2, N.J.S.A., which prescribes a period of two years for commencement of a personal injury action; R.S. 2A:31–3, N.J.S.A. which likewise prescribes a period of two years for an action for wrongful death, and the Jones Act which prescribes a period of three years for a negligence action. Burns v. Bethlehem Steel Co., 20 N.J. 37, 118 A.2d 544 (1955); Oroz v. American President Lines, supra.

 The present action was brought six years and four months after the accident, and more than four years after the running of the analogous limitations statutes.[17] The libellant urges that the timely filing of her earlier suit, the entry of her judgment and the prompt institution of this action upon ascertaining that her judgment was largely uncollectible, convincingly demonstrate that she was diligent rather than dilatory. Not so. Despite various remedies available to her, libellant was content to rely only upon her claim against the operator Eastern. There is nothing before the court to indicate that this was not a considered and informed decision at that time. Now, *six years later*, she seeks relief against the dredge. The passage of time seldom aids an aggrieved litigant. *Vigilantibus et non dormientibus subserviunt leges*, the laws aid those who are vigilant, and not those who sleep on their rights, is a maxim familiar to most, if not all, systems of jurisprudence. Benedict On Admiralty, (6th ed. 1940), vol. 3 sec. 462, pp. 290–291. Claimant's affidavit averring that the dredge has been in and around the navigable waters of the State of New Jersey for most, if not all, of the time between the accident and the present attachment has been uncontradicted. Once the effort was made, libellant had no apparent difficulty in attaching the dredge, substantially indicating that it could have been done as readily during the years of libellant's inaction. Cf. Claussen, supra, which involves similar circumstances.

---

17. See: n. 6 ante (2 years); Death on the High Seas Act, March 30, 1920, c. 111 sec. 1, 2, 41 Stat. 537, 46 U.S.C. §§ 761, 762 (2 years); Jones Act, ante n. 4 (3 years); Carriage of Goods by Sea Act, April 16, 1936, c. 229 sec. 1–16, 49 Stat. 1207, 46 U.S.C. §§ 1300, 1303 (1 year).

With respect to the prejudicial element of laches, libellant contends that if the libel for unseaworthiness against respondent dredge prevails, no prejudice results to claimant, since it may resort to the warranty of sale that the vessel was free and clear of all liens. This is sophistry. Unseaworthiness of a vessel is coupled with indemnification by the owner in maritime law.[18] The vessel alone is a party to this suit *in rem*. Yet the claimant-owner is placed in a precarious position whereby some 6 years after an occurrence his proprietorship rights inherent in the vessel may be adversely affected by libellant's dilatory action against the vessel. Since 1957, the offending dredge has pursued her course within the domestic ports of the local maritime community; and more than 3 years after the occurrence of the injury and subsequent death of libellant's decedent, claimant became and still is the vessel's owner. Claimant's affidavit that it had no notice of the assertable maritime lien claim of libellant stands uncontradicted. More than 4 years have elapsed since it became the owner of the vessel. Where a maritime lien is to be enforced to the detriment of a bona fide purchaser without notice, the libellant must act with extraordinary diligence. As against such a purchaser such lien will be lost in equity after the lapse of a much shorter period of time under the doctrine of laches, than under analogous limitation statutes. The Key City, 81 U.S. 653, 14 Wall. 653, 660, 20 L.Ed. 896 (1871); Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 94 F. 180, 189 (9 Cir. 1899); The Everosa, 93 F.2d 732 (1 Cir. 1937); Phelps v. The Cecelia Ann, 199 F.2d 627, 1952 A.M.C. 1968 (4 Cir. 1952); Gilmore & Black, The Law of Admiralty (1957) sec. 624–627; Norris, The Law of Seaman (2nd ed. 1962) sec. 454; Benedict On Admiralty (6th ed. 1940) sec. 464. In The Robert Gaskin, 9 F. 62, (D.C., E.D.Mich. 1881) where the libellant let 6 years elapse before filing his libel, the vessel having been within the jurisdiction several times and further, the vessel having been sold to a bona fide purchaser having no knowledge of the claim, it was held that libellant could not recover even though the libel had been filed before the sale, but process not effected until 3 months thereafter. In The Lauretta, 9 F. 622 (D.C.N.J.1881) at page 624, the following is aptly stated:

"There is no explanation of the delay in the present case. The alleged liability of the vessel was incurred in August, 1876. Nearly two years elapsed before the libel was filed. In the meantime the vessel was transferred to the claimant, without notice of the lien. She was within reach of the process of the courts, (Philadelphia Oyster trader in Delaware River and Bay) if the libellant had made any effort to hold her. I am clearly of the opinion that he ought not now be allowed to collect his claim out of the property of an innocent purchaser, and that the libel must be dismisssed." (Parentheses supplied.)

While it may be true as contended, that the institution of libellant's civil action and jury trial within 2 years of the maritime accident against Eastern, the offending operator of the vessel, demonstrates reasonable diligence in seeking redress, the selection of that remedy at that time indicates at best only a choice of remedy. Viewed against the unreasonably long interval between the occurrence of the injury and the present admiralty suit *in rem*, hindsight has shown the selection of the singular remedy of civil jury trial, at a time when the law made ample provision for multiple remedies, to have been improvident. While alternate pursuit of multiple remedies may be permissible, experience convinces that it is undertaken at one's peril, unless pursued with diligence and before

---

18. Crumady v. The J. H. Fisser, supra; Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 100, 66 S.Ct. 872, 90 L.Ed. 1099 (1945), supra; cf: Reed v. The Yaka, 373 U.S. 410, 412, 83 S.Ct. 1349, 10 L. Ed.2d 448 (1962), supra.

remaining remedies are lost. To disregard the protracted delay in seeking the present form of relief, to ignore the intervening equities which arose with the passage of time, merely because libellant failed to effect recovery on a civil judgment, or because she failed to seek appropriate remedies available at an earlier time, would be unconscionable and render meaningless traditional concepts of the equitable doctrine of laches. Consequently, the first cause of action of the libel will be dismissed.

The second cause of action in this libel is based upon the narrative facts of the first cause supplemented by the following allegations:

"21. Libellant alleges that the circumstances hereinbefore recited give rise to a maritime lien against the Dredge 'Queen.'"

"22. Libellant alleges that the finding of the jury hereinbefore related is *res judicata* of the liability of the Dredge 'Queen', and that therefore libellant is entitled to judgment in this cause of action."

■■■ By this cause of action, libellant is in effect seeking to take an *in personam* judgment obtained against a former charter operator, Eastern, and "docket" such judgment through the admiralty court as a maritime lien against the vessel. This effort, while ingenious, is no less *sophistic*. The court is aware of no reliable judicial authority for libellant's novel proposition, that an *in personam* judgment based upon *negligence*, even though that negligence might be grounded in the unseaworthiness of the provided vessel, against a charterer, or operator, gives rise to a maritime lien *in rem* which may be perfected by execution sale of the vessel.

■■■ A maritime lien has generic origin in the personalization of a vessel in Admiralty making it chargeable with it debts and obligations.[19] Such a lien is inchoate until ignited by an appropriate maritime event, as with an asserted maritime tort, which generates a cause of action for damages. The maritime lien merely dispenses with the common law requirement that the *res* must be reduced to possession; it does not extinguish the element of liability by the mere happening of an event upon which a maritime claim may be predicated for the judicial determination of a debt. It is rudimentary, that levy of execution and forced sale are means employed to satisfy an established debt or obligation. It is precisely the perfection of this lien by its fruition into liability *in rem* of the respondent dredge which has been precluded by the dismissal of the first cause of action. The *in personam* judgment against the operator is *res judicata* only of the operator's liability for a maritime tort grounded in negligence. It cannot serve as a basis for establishing *in rem* liability of the dredge against which judgment was not entered, nor against claimant, the present owner, who was not a party to that collateral civil action.[19] The *thing adjudicated* by the civil judgment in Pennsylvania was the personal liability of Eastern, nothing more. Attempts to impress the vessel *per se* with liability *in rem,* in admiralty, predicated upon personal liability of another would be tantamount to shifting liability for fault based upon negligence in violation of the Jones Act and the general maritime law discussed above. Consequently, the second cause of action of this Libel fails in law and must be stricken.

The question of deprivation of use of the vessel because of monition on January 17, 1964, initially raised by claimant in its pleadings, and its subsequent release on pledged security March 24, 1964, has not been pressed by claimant in brief, argument or by proofs and, therefore, is deemed moot.

For the reasons assigned, the Libel is hereby dismissed. An appropriate order may be submitted by counsel with consent, or upon notice.

19. Baun v. The Ethel G., 125 F.Supp. 835 (D.C.Alaska 1954); Norris, The Law of Seamen (2nd ed. 1962) sec. 443, 444.