**GLADYS SYLVESTER, et al., Plaintiffs**

**v.**

**UNITED STATES OF AMERICA, Defendant, Cross-Claimant and Third-Party Plaintiff**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Defendant and Third-Party Defendant and MOTOR VESSEL M/V "REEF QUEEN", et al., Third-Party Defendants**

Civil No. 1979/97

District Court of the Virgin Islands

Div. of St. Croix

March 31, 1981

400

RICHARD DALEY, ESQ., Christiansted, St. Croix, V.I., *for plaintiffs*

JAMES CARROLL, ESQ., Assistant United States Attorney (United States Attorney's Office), St. Thomas, V.I., *for defendant cross-claimant and third-party plaintiff*

WILLIAM C. MURRAY, ESQ., Assistant Attorney General (Department of Law), Christiansted, St. Croix, V.I., *for defendant and third-party defendant*

JOEL H. HOLT, ESQ., Christiansted, St. Croix, V.I., *for third-party defendants*

ELLEN G. DONOVAN, ESQ., Christiansted, St. Croix, V.I., *for third-party defendants*

KNOX, *Judge*

## MEMORANDUM

This is a wrongful death action involving numerous parties. Before the court is a motion for summary judgment (Rule 56

F.R.C.P.) brought by one of the third-party defendants. The movant, M/V Reef Queen (hereinafter "Reef Queen"), seeks judgment in its favor on the contractual indemnity claim raised against it by defendant third-party plaintiff the United States. Despite the necessary maritime dressing the issue presented can be simply stated:

A party purchased a vessel without notice of any claims or liens against the vessel. Nearly a year after the purchase a third party seeks to sue the vessel itself on the basis of an indemnification clause in a contract between the third party and the vessel's previous owners. Can the third party force the sale of the purchaser's vessel to satisfy any indemnification claims it may have against the vessel's former owner?

As set forth more fully below, the court finds that when the third party has delayed processing its claim, as here, any rights it might have had against the vessel are lost. Accordingly, the Reef Queen's motion will be granted.

The United States and the Reef Queen are in accord as to the facts necessary to resolve the issue presented. In 1978 B. J. Watersports, Inc. (hereinafter "B. J. Watersports" or "concessioner") owned the Reef Queen and used the vessel to transport visitors from Christiansted, St. Croix, to the Buck Island Reef National Monument. This service was performed pursuant to a concession permit between B. J. Watersports and the United States Government. For the purposes of this opinion, the terms of this permit included a clause indemnifying the United States for any losses incurred as a result of the concessioner's acts or omissions in connection with the concession. The terms of the permit also pledged a "first lien" to the United States on all the concessioner's property as security for the faithful performance of the concessioner's obligations under the permit.

In November of 1978, a student drowned at Buck Island. The student was with a group brought to Buck Island by B. J. Watersports and aboard the Reef Queen. Again, for the purposes of this opinion the indemnification provisions of the concession permit will be presumed applicable to any losses incurred by the United States as a result of this death. In May of 1979, the parents of the drowned youth brought this wrongful death action against the United States. During that same month, B. J. Watersports sold the Reef Queen to Magton Ltd. In April of 1980, eleven months later, the United States impleaded both B. J. Watersports and the Reef Queen, seeking contribution and indemnification. The Reef Queen was sued on both a contractual and tort theory, however, the tort claim was subse-

402

quently dropped by stipulation between the parties. Thus a contractual indemnity claim, based on the concession permit, is the sole claim against the Reef Queen. The Reef Queen urges that the claim is inadequate as a matter of law. The United States disagrees.

At the outset it must be noted that the United States has brought this contract action against Reef Queen as an admiralty in rem proceeding. The United States urges no other law which would permit this direct action against the ship, nor is the court aware of such other law. Accordingly, the issues presented are controlled by the law of admiralty.

 In many circumstances the law of admiralty permits a direct action against a ship for claims arising in either tort or contract. Such a direct action is termed an admiralty action in rem. If a claimant prevails in an in rem action, claimant's award is satisfied by the proceeds from the judicial sale of the vessel concerned. The availability of in rem proceedings is controlled by the existence or absence of a "maritime lien": if the claim creates a maritime lien, in rem process is available; if the claim does not create a maritime lien, in rem process is not available.[1] The Rock Island Bridge, 73 U.S. (6 Wall) 213, 215 (1877); Supplemental Rule C(1)(a) (Fed. R. Civ. P.); 2 Am.Jur.2d, Admiralty §§ 95, 97.

 Maritime liens are not to be confused with common-law land liens. "The beginning of wisdom in the law of maritime liens is that maritime liens and land liens have little in common. A lien is a lien is a lien, but a maritime lien is not". Gilmore and Black, The Law of Admiralty (2d ed. 1975) § 9-2. It is appropriate to list some of the pertinent characteristics of maritime liens:

> 1. The maritime lien arises out of contract or tort. Only certain types of maritime claims give rise to liens. And the parties cannot by agreement confer lien status on a claim which is not by nature a lien claim or waive the conditions for attachment.
> . . .
> 3. The maritime lien can be "executed" (which is the admiralty terminology for "foreclosed") only by an admiralty court acting in rem.

---

[1] Admiralty jurisdiction is not precluded by the absence of a maritime lien and an in personam admiralty action can be brought on a maritime contract even if the contract is not of the type which traditionally gives rise to liens. 2 Am.Jur.2d Admiralty § 60; Benedict on Admiralty (7th ed. 1975) § 25; 29 A.L.R. Fed. 325, § 2.

. . .

5. The validity of a maritime lien depends neither on possession nor (except for the preferred ship mortgage, which is statutory) on notice through filing. It is therefore often referred to as a "secret" lien. It is also said to be "indelible": that is, since the maritime lien can be executed only by the admiralty court acting in rem, it is, until that court has so acted, good "against the world", including the good faith purchaser of the ship without notice of the lien's existence. On the same principle the maritime lien is not affected by bankruptcy or reorganization. The "indelibility" of the lien is, however, seriously affected by the doctrine of laches, to be shortly referred to.
. . .

7. A maritime lien is of course extinguished by payment of the underlying claim. It can also be lost by laches in its prosecution and the doctrine of laches largely destroys the lien's theoretical "indelibility" . . . What is lost, it may avoid confusion to point out, is the lien, the claim against the ship, the right to proceed in rem: the personal liability of any person subject to the claim is not affected by the . . . (loss) of the lien.

Black and Gilmore, The Law of Admiralty (2d ed. 1975) § 9-2 (see also Benedict on Admiralty (7th ed. 1975) §§ 31–46 and 61–66).

From the foregoing it is apparent that the United States' in rem indemnity claim against the Reef Queen can be valid only if:

(a) The concession permit is a maritime contract (this is a prerequisite for *any* admiralty jurisdiction over a contract dispute 29 A.L.R. Fed. 325);

(b) The maritime contract is of the type which creates a maritime lien;

(c) and neither the doctrine of laches or a judicial sale has destroyed the maritime lien so created.

Although the concession permit is probably a maritime contract and possibly creates a maritime lien, the facts show that, as a matter of law, the United States has not diligently pursued its claim and thus is subject to the doctrine of laches.

■ The court has little problem viewing the concession permit as a maritime contract. Certainly the permit ". . . relates to a matter, transaction or service that depends on, assists or furthers transportation on navigable waters." 2 Am.Jur.2d, Admiralty § 61. See 29 A.L.R. Fed. 325.

It is more difficult to determine whether the concession contract is

a maritime contract which creates a maritime lien. The most fertile source of contract maritime liens is the area of "provision of necessaries".[2] This source of contract maritime liens is largely controlled by the Federal Maritime Lien Act (46 U.S.C. §§ 971–975). The time is long past when contracts were deemed not to create liens unless actual "necessaries" were provided for the ship. "Assuming its maritime nature, almost any type of service claim will today be held within the lien act . . . ." Black & Gilmore, The Law of Admiralty (2d ed. 1975) § 9-35; See Carl Enterprises v. Hudson Handler, 475 F.Supp. 42 (D.C. Ala. 1979) (maritime "necessaries" lien arising from provision of airplane tickets for ship's crew) and Stern, Hays & Lang, Inc. v. M/V Nili, 407 F.2d 549 (5th Cir 1979) (maritime lien can be created by advertising contract). Despite the wide scope given to the term "necessaries" under the Lien Act, the court has some difficulty in applying the label "service contract" to the concession permit sub judice. Conceptually the United States provided no service to the Reef Queen, rather it simply permitted the vessel to operate on a particular route.

An alternative source for contract maritime liens is an alleged breach of a contract of affreightment. United States v. S/S Lucie Schulte, 343 F.2d 897 (2d Cir. 1965). Such liens are not subject to the Federal Maritime Lien Act. Black and Gilmore, The Law of Admiralty (2d ed. 1975) § 9-46a. Although the effect of the concession permit sub judice was the transportation of passengers, arguably analogous to the shipment of cargo, the court also has difficulty with the use of this source of contract liens in this case. Again, conceptually the United States made no contract to carry freight or passengers. The concession permit simply establishes the Reef Queen's right to make contracts to carry passengers to Buck Island.

Fortunately, the court need not resolve the question of the creation of a maritime lien from either of the discussed sources. Rather, the court finds that even if a maritime lien was created by the concession permit, the doctrine of laches bars the assertion of that lien in this case.

---

[2] This source of maritime liens has its origins in 19th century trade and is the law's response to the merchant's need for some security when extending credit to a visiting ship. Of course the credit made available by this security device facilitated the ship's business as well. Gilmore & Black, The Law of Admiralty (2d ed. 1975) § 9-8 (1975); Benedict on Admiralty (7th ed. 1975) § 21. "The maritime lien is a unique security device which serves the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away." Rife Petroleum Co. v. Cibro Sales Corp., 601 F.2d 1385, 1389 (10th Cir. 1979).

■ Despite the supposed indelibility and the secret nature of maritime liens, the law does provide protection for parties other than the lienholders:

> The lienor who delays (enforcement of his claim) until his claim has become "stale" faces the penalty of losing his lien altogether. How quickly a lien becomes stale depends largely on whether the ship is in the possession of the owner who incurred the claim or has passed into the hands of a purchaser who has bought it without notice of the lien's existence. The lapse of a short period will bar the lien against a purchaser without notice, although the underlying claim continues enforceable against the original owner. When the ship is still owned by the person who is liable on the claim, there will in most circumstances be no loss of lien status until the claim has itself become timebarred . . . . Attempts to assert liens over the defense of good faith purchase without notice have been few and usually unsuccessful. Presumably counsel turn to such litigation as a last resort and only when the claim against the original owner is no longer worth pursuing.

Black and Gilmore, The Law of Admiralty (2d ed. 1975) § 9-77.

When delay is present, the cases are consistent in their rejection of liens against subsequent good faith purchasers: The Everosa (Southern Goal and Code v. Kugniecibas), 93 F.2d 732 (1st Cir. 1937), six-month-old lien held to be "stale"; The Everosa (Swan & Sons, Inc. v. Kugniecibas), 20 F.Supp. 8 (E.D.N.Y. 1937), failure to libel ship on the three brief occasions when she returned to American waters bars lien; and The Arlene—The Bacardi (Fey v. Jewell), 1951 A.M.C. 1205 (W.D. Wash. 1951), eleven-month-old lien held to be "stale". "Where a maritime lien is to be enforced to the detriment of a *bona fide* purchaser without notice, the libelant must act with extraordinary diligence". McLaughlin v. Dredge Gloucester, 230 F.Supp. 623, 630 (D.N.J. 1964).[3]

The facts in the matter sub judice do not demonstrate the required diligence. As noted, the complaint against the United States was filed in May 1979. Assuming that the concession permit creates a maritime lien, at that time the United States could have libeled the Reef Queen on the basis of that lien. This was not done.

---

[3] See also: In Waterways Marine, Inc. v. Brooks Liquid Transport Inc., 291 F.Supp. 703 (N.D. Ill. 1968) and Phelps v. The Cecilia ANN, 199 F.2d 627 (4th Cir. 1952); Contra Layton Industries, Inc. v. Gladiator, 263 F.Supp. 356 (D. Mass. 1967).

Eleven months were allowed to pass prior to the impleading of the Reef Queen and the attempt to enforce the lien.

The facts further indicate that Magton Ltd. was a good faith purchaser without notice of any liens held by the United States. Although the lien "came into existence" as soon as the United States could raise a claim based on the concession permit, the lien was secret. It was not until eleven months after the sale of the vessel that suit was brought against the Reef Queen and its former owner. Magton Ltd. had no way of knowing of the secret lien prior to its notice of the United States' third party complaint. Accordingly, Magton Ltd. is a purchaser without notice. There are no allegations of fraud or collusion in the sale of the Reef Queen to Magton Ltd., thus the required good faith can be presumed.

The Reef Queen is in the hands of a good faith purchaser without notice of any liens. Even if it is assumed that the indemnification provisions of the concession permit are applicable and that the concession permit is a maritime contract which gives rise to a maritime lien, the lack of diligence with which the United States sought to enforce this lien has caused the destruction of the lien pursuant to the doctrine of laches. Without a maritime lien the United States has no claim against the Reef Queen. Accordingly, the Reef Queen's motion will be granted and, pursuant to Rule 56 Fed. R. Civ. P., summary judgment will be entered in the Reef Queen's favor.

## ORDER

For the reasons set forth in the opinion dated March 31, 1981 and attached herewith,

IT IS ORDERED that Third-Party Defendant Motor Vessel "Reef Queen's" motion for summary judgment be, and hereby is, granted.