**JOHN W. STONE OIL DISTRIBUTOR, INC., Plaintiff,**

v.

**The M/V MISS BERN, Defendant.**

**Civ. A. No. 85-0984-T-C.**

United States District Court, S.D. Alabama.

June 25, 1987.

---

**29.** *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 854 (2d Cir.1984).

M. Kathleen Miller, Armbrecht, Jackson, DeMouy, Crowe, Holmes and Reeves, Mobile, Ala., for plaintiff.

George L. Simons, Mobile, Ala., for defendant.

DANIEL HOLCOMBE THOMAS, District Judge.

This non-jury admiralty case was heard on June 8, 1987. The Court, after careful review of all the evidence and documents which were submitted by each side, makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The counterclaim plaintiff, Glenn Towing, Inc. (Glenn Towing) is a corporation organized under the laws of the State of Alabama having its principal place of business in Mobile, Alabama.

2. The counterclaim defendant, John W. Stone Oil Distributor, Inc. (John W. Stone) is a corporation organized under the laws of the State of Louisiana having its principal place of business in Gretna, Louisiana.

3. The owner of the M/V MISS BERN on January 23, 1985, was Miss Bern, Inc. Kenneth A. Pizani, President of Miss Bern, Inc., was also a principal of Kenny Marine.

4. There is no dispute that, on January 23, 1985, Stone furnished fuel and oil to the M/V MISS BERN at the request of Kenny Marine. As reflected by Stone's invoices dated January 30, 1985, and January 31, 1985, respectively, the amount due Stone for the fuel and oil totaled $9,688.63.

5. In late March 1985, approximately 50 to 60 days after Stone's invoices were rendered, John W. Stone, President of Stone, contacted Kenneth Pizani, President of Miss Bern, Inc., about payment of Stone's invoices. Mr. Pizani told Mr. Stone that payment would be forthcoming in two weeks or better.

6. After two to three weeks passed, Mr. Stone again contacted Mr. Pizani about payment of the invoices. During this second conversation, which occurred in April 1985, Mr. Pizani advised Mr. Stone that Equilease Corporation (Equilease), who held a First Preferred Ship Mortgage on the vessel, had taken the vessel back and that defendant and counter-plaintiff Glenn Towing, Inc. had the vessel. Mr. Pizani advised Mr. Stone that Equilease would take care of the vessel's obligations to Stone.

7. Between Mr. Stone's two telephone conversations with Mr. Pizani, Glenn Towing had purchased the vessel from Miss Bern, Inc. The bill of sale was executed on April 8, 1985, approximately ten weeks after Stone furnished the fuel and oil to the MISS BERN and six weeks after Stone's invoices became due. On the same day, Glenn Towing assumed a First Preferred Ship Mortgage on the vessel which was held by Equilease and which had been recorded prior to the time Stone furnished the fuel and oil to the MISS BERN on January 23, 1985. On April 8, 1985, the records of the U.S. Coast Guard in New Orleans showed only two liens against the M/V MISS BERN, the first being the Equilease mortgage and the second a $28,396.52 lien claimed by George Engine Company, Inc. Pizani stated that there were no other

liens against the vessel and the Bill of Sale warranted that there were no liens and covenanted to hold harmless and indemnify Glenn Towing on any undisclosed liens. Thereafter Glenn Towing employed the vessel in its general maritime towing business.

8. After learning from Mr. Pizani that Miss Bern, Inc. no longer had the vessel, Mr. Stone contacted Gerry Heap of Equilease Corporation about payment of Stone's invoices. Mr. Heap told Mr. Stone that Equilease would resolve the matter and that Mr. Heap would check with Equilease's New York office about payment of the invoices. Mr. Heap advised Mr. Stone that Glenn Towing had the MISS BERN and gave Mr. Stone Glenn Towing's address.

9. Mr. Stone tried to reach Mr. Heap several times during the next several weeks but was unable to do so. Mr. Stone then contacted the attorney in New Orleans who represents Equilease. The attorney would not answer Mr. Stone's questions about payment of the invoices. Several weeks later, Mr. Stone was able to reach Mr. Heap. Mr. Heap told Mr. Stone that Equilease's New York office had determined that Equilease would not pay the amounts owed by the MISS BERN to Stone. Although Stone testified that his company always looked to the credit of the vessel when selling fuel on account, John W. Stone did not file a notice of claim of lien against the M/V MISS BERN. John W. Stone also made no subsequent efforts to collect the amounts due from Kenny Pizani or Kenny Marine.

11. In late May 1985, John W. Stone mailed the fuel and oil invoices to Glenn Towing. Upon receipt of the bills Charles Hilburn called Stone and told him that Glenn Towing had a clear Bill of Sale to the vessel, that he knew nothing about fuel bills, and that Glenn Towing was not going to pay the bills. Stone called Glenn Towing again in June and July and was told each time that Glenn Towing was not going to pay the bills.

12. John W. Stone turned the matter over to his attorneys in New Orleans in the

summer of 1985. Stone furnished them with copies of the invoices and they checked the Coast Guard records and found that the M/V MISS BERN was owned by Glenn Towing and that it was subject to a First Preferred Ship Mortgage held by Equilease. Stone did not tell the attorneys about Pizani's late payment record on the Kenny Marine account or about how he let time time lapse in his efforts to collect the bills from Pizani.

13. Subsequently, Stone's attorney contacted a firm in Mobile, Alabama, and asked that firm to file an *in rem* proceeding against the MISS BERN on behalf of Stone.

14. On August 2, 1985, John W. Stone Oil Distributor, Inc. filed a verified complaint *in rem* against the M/V MISS BERN. The complaint alleged that on or about January 30, 1985, John W. Stone furnished fuel and oil to the vessel at the request of the vessel's owner, that the reasonable value of the fuel and oil was $9,688.63, that the sum claimed was unpaid, and that the unpaid fuel and oil bill constituted a maritime lien against the vessel. John W. Stone prayed that the vessel be arrested, condemned and sold to satisfy the maritime lien. The vessel was arrested in Mobile, Alabama, on August 2, 1985. Stone acknowledged that Glenn Towing did not owe John W. Stone for the fuel and oil and John W. Stone's Louisiana counsel admitted that the vessel was arrested for the purpose of forcing someone to pay this fuel bill.

15. Charles Hilburn was President of Glenn Towing Company, the bona fide purchaser of the M/V MISS BERN and David Hilburn was also an employee. Prior to the arrest on August 2, 1985, a phone conversation took place between Stone and one of the Hilburns. The Hilburns were able to remove their personal possessions from the vessel before she was seized.

16. David Hilburn testified that Charles Hilburn told him of the impending arrest of the vessel and that he called Stone on August 2nd. He testified that he told Stone that Glenn Towing was not going to pay the bill and that Glenn Towing needed the vessel to move a tow of four empty barges to Harriman, Tennessee. Stone said that he didn't give a damn about what kind of contract Glenn Towing had and that if Glenn Towing wanted to work the boat they had to pay the bill. Hilburn also said that Stone acknowledged the superiority of the Equilease mortgage and recognized the fact that he wouldn't get anything out of the vessel's arrest and sale but that he was going to arrest the boat anyway just to show Equilease that he could do it. John W. Stone received nothing from the proceeds of the sale of the vessel. Even assuming that Mr. Stone made such statements, the statements have no bearing upon the validity of Stone's maritime lien. At most, Mr. Stone was advising Glenn Towing of his intent to exercise Stone's legal right to seize the vessel if Stone was not paid and such statements certainly do not constitute bad faith or maliciousness.

■ 17. Turning to Glenn Towing's evidence with respect to its alleged damages, the Court initially finds that Glenn Towing took no action to mitigate any loss it suffered after the MISS BERN was seized. Charles Hilburn admitted that Glenn Towing did not make any effort to post a bond or any other security or to provide a letter of credit so that either the seizure of the vessel could have been avoided or the vessel could have been released after the seizure. There was no evidence that Glenn Towing attempted to negotiate with Equilease to arrange for the vessel's release. Moreover, Glenn Towing made no effort to lease another boat to accomplish any work it claims it lost.

18. Glenn Towing introduced absolutely no evidence to support a finding that Glenn Towing suffered damages for loss of use of the vessel as a result of the seizure. The Hilburns claimed that at the time the vessel was seized, Glenn Towing intended to use the MISS BERN to move a tow of four empty barges to Harriman, Tennessee, where the barges would be loaded with coal, and then to transfer the loaded barges to Leroy, Alabama. The Hilburns admitted, however, that Glenn Towing was able to make this trip by using another vessel

owned by Glenn Towing, the CAPTAIN DON.

19. Charles Hilburn claimed that the trip to Harriman made by the CAPTAIN DON was the first trip pursuant to a verbal agreement between Glenn Towing and Warrior River Towing Company, Inc. to perform this run for a six-month period. Mr. Hilburn's testimony about a six-month contract was directly contradicted, however, by that of Ron Brown, Vice President of Warrior River Towing Company. Mr. Brown testified that Glenn Towing had performed work for Warrior River but only on a trip-by-trip basis. According to Mr. Brown, Warrior River never had a contract with Glenn Towing to haul barges loaded with coal from Harriman, Tennessee, to Leroy, Alabama, which was to run for a minimum of six months and, in fact, Warrior River never had any long-term agreement with Glenn Towing. Mr. Brown testified that, to his knowledge, Glenn Towing had never turned down any work offered by Warrior River and that Glenn Towing was able to perform all of the work Warrior River requested. Finally, Mr. Brown confirmed that the reason that Warrior River stopped offering work to Glenn Towing had nothing to do with the number of boats Glenn Towing had available. Based upon Mr. Brown's testimony, the Court concludes that Glenn Towing never had an agreement with Warrior River Towing Company.

20. Glenn Towing did not introduce sufficient evidence to support a claim for its alleged lost profits. The absence of any evidence establishing the actual earnings of the vessel or a comparable vessel during this period would preclude the Court from making any findings as to loss of use even if the Court held that Glenn Towing was entitled to recover on the claim of wrongful seizure.

21. To the extent any of these Findings of Fact constitute Conclusions of Law, they are hereby adopted as both.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter in suit herein pursuant to Title 28 U.S.C. § 1333 and Rule 9(b) of the Federal Rules of Civil Procedure. Venue is properly laid in the Southern District of Alabama.

2. The Federal Maritime Lien Act, 46 U.S.C. § 971 et seq, mandates that a vessel is liable in rem when necessaries are furnished to a vessel when the owner or one authorized by the owner purchases the goods. Section 971 of the Lien Act provides:

> Any person furnishing repairs, supplies, towage, use of drydock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem and it shall not be necessary to allege or prove that credit was given to the vessel.

46 U.S.C. § 971. Section 972 of the Lien Act further provides:

> The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of drydock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supplies is intrusted. . . .

46 U.S.C. § 972.

3. It is undisputed that, on January 23, 1985, Stone furnished fuel, oil and other supplies to the M/V MISS BERN in the amount of $9,688.63. Fuel and oil furnished to a vessel for its own use to enable it to proceed with its voyage are clearly "necessaries" giving rise to a maritime lien pursuant to the Lien Act. See, Tramp Oil and Marine, Ltd. v. M/V MERMAID I, 630 F.Supp. 630 (D. Puerto Rico 1986); Belcher Co. of Alabama, Inc. v. M/V MARATHA MARINER, 724 F.2d 1161, 1163 (5th Cir. 1984). Accordingly, pursuant to the terms of the Lien Act, when Stone furnished the fuel and oil to the M/V MISS BERN on January 23, 1985, a maritime lien against the vessel arose in Stone's favor.

■ 4. In order for Glenn Towing to prevail on its counterclaim for wrongful seizure, Glenn Towing must first establish that Stone did not have a maritime lien against the MISS BERN. *TTT Stevedores of Texas, Inc. v. M/V JAGAT VIJETA*, 696 F.2d 1135, 1140–41 (5th Cir.1983). If Glenn Towing demonstrates that Stone did not have a maritime lien against the vessel, then Glenn Towing must establish the existence of bad faith, malice or gross negligence on the part of Stone which proximately caused damage to Glenn Towing. *Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir.1937). The undisputed evidence, however, affirmatively establishes that Stone had a maritime lien against the MISS BERN which precludes a claim against Stone for wrongful seizure.

5. The Court rejects Glenn Towing's contention that the seizure of the MISS BERN was "wrongful" because Glenn Towing was a bona fide purchaser without notice of Stone's lien and Stone had not filed a claim of lien with the Coast Guard. The Federal Maritime Lien Act, *supra,* does not require the recording of liens. Maritime liens are "secret" and clearly may operate to the prejudice of purchasers without notice. *Piedmont and George's Creek Coal Company v. Seaboard Fisheries Company*, 254 U.S. 1, 12, 431 S.Ct. 1, 65 L.Ed. 97 (1920). Unless the purchaser of a vessel obtains title to a vessel by Marshal's sale, the purchaser of a vessel acquires imperfect title and maritime liens are regularly enforced against bona fide purchasers without notice. Purchasers of vessels accordingly must protect themselves by means of warranties against liens in their bills of sales, such as the warranties set forth in the bill of sale from Miss Bern, Inc. to Glenn Towing, Inc.

■ 6. Whether a notice of claim or lien has been recorded with the Coast Guard and whether a lien is being asserted against a bona fide purchaser without notice are only relevant to a determination of whether a lien is barred by laches, which is a procedural defense to the enforcement of a maritime lien.

7. Laches is a factual question which must be determined by examining the circumstances of a particular case. "The courts are institutions for the settlement of disputes both as to law and facts. Where citizens reasonably disagree concerning their rights, powers, and privileges, the doors should be kept open for an orderly determination of their difference." *Frontera Fruit Co., Inc. v. Dowling, supra,* at 297.

■ 8. It is well settled that a claim asserting a maritime lien can be barred by laches. "Laches is an equitable principle terminating claims which are asserted after inexcusable delay and which result in prejudice to the party against whom the claim is asserted." *Trivizas v. Tanjong Shipping Company*, 1982 A.M.C. 2520 (S.D.N.Y. 1982); *McLaughlin v. Dredge Gloucester*, 230 F.Supp. 623, 1964 A.M.C. 2123 (D.N.J. 1964); 2 *Benedict on Admiralty*, Section 62, p. 5–7 (6th Ed.1981). "Plaintiffs are required to act with 'extraordinary diligence' to enforce a maritime lien against a bona fide purchaser without notice." *Trivizas v. Tanjong Shipping Company, supra,* at 2523, *McLaughlin v. Dredge Gloucester, supra. The Everosa*, 93 F.2d 732, 1938 A.M.C. 82 (1st Cir.1937); *Merchants & Marine Bank v. F/V T.E. WELLS*, 289 F.2d 188, 1961 A.M.C. 1042 (5th Cir.1961). The claim will lapse in a much shorter time and the court will undertake a more rigid scrutiny of the circumstances of the delay in cases where the vessel is in the hands of a bona fide purchaser as opposed to cases where there has been no change in ownership. *The Key City*, 81 U.S. (14 Wall.) 653, 20 L.Ed. 896 (1871).

> While no fixed or arbitrary rule has been established which would be of universal application, the governing principle which has been applied in most of the cases that have been examined, and which seems consonant with natural justice and equity, is that wherever a secret lien is sought to be established upon a vessel which has passed into the possession of a bona fide owner who was ignorant of its existence, and who had no reasonable opportunity to discover it, the court will make rigid scrutiny of the cir-

cumstances of the delay, and if there has been reasonable time to enforce the lien, and the vessel has been within reach of process, the party neglecting to avail himself of it will not be allowed to enforce it to the prejudice of an innocent third party. The diligence demanded must accord with the circumstances of each case and existing opportunities, and, a court of admiralty will refuse its aid in the enforcement of the lien if, under the same circumstances, a court of equity would do so, a change of circumstances affecting the rights and conditions of the parties being more considered than mere lapse of time. *Norfolk Sand & Cement Co. v. Owen*, 115 F. 778 (4th Cir.1902).

9. The court finds that Glenn Towing was a bona fide purchaser for value without knowledge or notice of John W. Stone Oil Distributor's claim of lien. In determining whether the lienholder has exercised the high degree of diligence required the Court will consider the following factors: (1) did the lienholder file a notice of claim of lien in the vessel's homeport as permitted by Title 46 U.S.C. § 925; (2) did the lienholder fail to arrest the vessel when he had the opportunity to do so; and, (3) did the lienholder wait for a time longer than that permitted by analogous state statutes of limitation before filing his action to enforce his lien? *Tagaropulos S.A. v. S.S. Santa Paula*, 502 F.2d 1171, 1974 A.M.C. 2453 (9th Cir.1974); *Waterways Marine, Inc. v. Brooks Liquid Transport, Inc.*, 291 F.Supp. 703, 1968 A.M.C. 2718 (N.D.Ill.1968). In the instant case, John W. Stone Oil Distributor never filed a notice of claim of lien with the U.S. Coast Guard even though the vessel's homeport was New Orleans, Louisiana, and John W. Stone Oil Distributor's place of business was directly across the Mississippi River from New Orleans in Harvey, Louisiana. Further, John W. Stone could offer no reasonable explanation for its failure to do so in this particular case. The evidence shows that the fuel and oil were invoiced by John W. Stone to Kenny Marine on January 30, 1985, and January 31, 1985. The invoices by their terms were due in thirty (30) days. The invoices were not paid within the thirty

(30) day period and John Stone, Jr., waited an additional 20 to 30 days before contacting Kenny Pizani for payment. The vessel was taken from Louisiana waters on or about March 7, 1985, approximately 6 to 7 days after the invoices became due. The Court, however, does not suggest that John W. Stone was dilatory for failing to arrest the vessel when the invoices were only a few days past due, but given the poor payment record of Kenny Marine in the past and Kenny Pizani's breach of his promise to John Stone, Jr., to pay the bills upon the vessel's return from its trip, and the ease with which John W. Stone could have filed a notice of lien, the Court does find that John W. Stone failed to exercise reasonable diligence by failing to file a notice of claim of lien when the invoices became past due. This is particularly true in light of John W. Stone's assertion that it always relied on the credit of the vessel when selling fuel on account.

10. Although this court is not bound by any state statute of limitations, the fact that a state statute bars the cause of action can be considered when the equitable defense of laches is asserted. *Waterways Marine, Inc. v. Brooks Liquid Transport, supra; Phelps v. Cecelia Ann*, 199 F.2d 627, 1952 A.M.C. 1968 (4th Cir.1952). The transaction in the instant case occurred in Louisiana and there is no question that, if state law controlled the instant case, the law of Louisiana would apply. Article 3237 of the Louisiana Civil Code grants a supplier of fuel to a vessel a privilege or lien on the vessel, but an action to enforce this privilege or lien must be brought within six months. The State of Alabama also has a similar statute, Code of Alabama 1975, § 35–11–60, and under it the action to enforce the lien also must be brought within six months. *See First Maryland Lease Corp. v. M/V Golden Egret*, 764 F.2d 749 (11th Cir.1985). Since the sale took place on January 23, 1985, both the Louisiana and Alabama statutes of limitation would have barred John W. Stone's cause of action on July 23, 1985. Thus, this court considers the appropriate statute of limitations and finds that Stone is guilty of lach-

es since the M/V MISS BERN wasn't seized until August 2, 1985.

The court finds further evidence that John W. Stone failed to act with the required degree of diligence by failing to file a notice of claim of lien in the testimony of Charles Hilburn, President of Glenn Towing, Inc. Charles Hilburn testified to the effect that on April 8, 1986, the date on which Glenn Towing purchased the vessel and assumed the Preferred Ship Mortgage, a review of the Coast Guard records revealed an unsatisfied claim of lien filed by George Engine Company, Inc. Hilburn stated that because of this lien, he as President of Glenn Towing, had decided not to purchase the vessel and only did so after Equilease agreed to pay the claim. Also, the court finds that Kenny Pizani gave Glenn Towing a verbal assurance that there were no liens and a written Bill of Sale warranting that there were no liens and promising to indemnify and hold Glenn Towing harmless if a lien existed. On April 8, 1985, 75 days had elapsed since the fuel and oil had been delivered to the vessel and by then the invoices were 38 days past due. John W. Stone's failure to record a claim of lien coupled with Kenny Pizani's verbal and written assurances that there were no liens lulled Glenn Towing into failing to protect itself from possible liens. *The Everosa, supra.* Glenn Towing was denied the opportunity to protect itself and the absence of any recorded claim of lien induced the company to purchase the vessel and assume a substantial financial obligation.

John W. Stone's failure to record a claim of lien was clearly prejudicial to Glenn Towing and the Court finds that by not recording a claim of lien, John W. Stone failed to exercise the high degree of diligence necessary to enforce a maritime lien against a bona fide purchaser without notice. John W. Stone was, therefore, guilty of laches and to penalize the vessel's innocent purchaser would work a gross inequity.

■ 11. Even though the court concludes that Stone's lien is barred by laches, this would not affect the Court's conclusion that Stone had a maritime lien. A finding by the court that Stone's lien was barred by laches does not give rise to a claim for wrongful seizure since Stone has the right to have the court determine whether or not its lien was barred by laches.

■ 12. Turning to the question of Glenn Towing's alleged damages, even if the court held that Glenn Towing was entitled to recover on its counterclaim, Glenn Towing did not introduce any evidence from which the court could conclude that Glenn Towing suffered damages as a proximate result of any conduct on the part of Stone. Lost profits are compensable only if they can be proven with reasonable certainty. *The Conqueror*, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897). There was no evidence introduced upon which the court could establish lost profits with reasonable certainty.

A Judgment will be forthwith entered in accordance with the above findings of fact and conclusions of law.

### JUDGMENT

Pursuant to the Findings of Fact and Conclusions of Law entered this date, it is ORDERED, ADJUDGED and DECREED that Judgment, be and hereby is, entered in favor of the plaintiff, John W. Stone Oil Distributor, Inc., and against the defendant, The M/V MISS BERN, for wrongful seizure and it is also ORDERED, ADJUDGED and DECREED that Judgment be, and hereby is, entered in favor of the defendant, The M/V MISS BERN, and against the plaintiff, John W. Stone Oil Distributor, Inc., for a maritime lien.

Each party is to bear its own costs.